UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KENNETH SAMUELS,

                Plaintiff,

      -v-

COMMISSIONER BRIAN FISCHER, ALBERT
PRACK, SUPERINTENDENT PHILIP D. HEATH,
D. KEYSER, M. BARNES, C. GAMBLE,
CORRECTION CAPTAIN R. BRERETON,
CORRECTION SERGEANT K. WHITE,
CORRECTION OFFICER L. GOULD, T.
BELLINGER, R. WOODY, JR., CORRECTION
OFFICER C. DOWTIN, CORRECTIONAL
OFFICER J. FREEMAN, CORRECTIONAL SGT.
SCHRADER, and CORRECTIONAL OFFICER S.
LUCIANO,

                Defendants.

Case No. 13-CV-8287 (KMK)

OPINION & ORDER

Appearances:

Kenneth Samuels
Malone, NY
*Pro Se*

Mary Kim, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff Kenneth Samuels ("Plaintiff") brings this action against defendants Brian

Fischer ("Fischer"), Albert Prack ("Prack"), Philip Heath ("Heath"), William Keyser ("Keyser"),

Michael Barnes ("Barnes"), Corey Gamble ("Gamble"), Ronald Brereton ("Brereton"), Kenneth

White ("White"), Brian Schrader ("Schrader"), LaToya Gould ("Gould"), Timothy Bellinger

("Bellinger"), Ronald Woody ("Woody"), Calvin Dowtin ("Dowtin"), Jonathan Freeman ("Freeman"), and Steven Luciano ("Luciano") alleging violations of his constitutional and statutory rights pursuant to 42 U.S.C. § 1983.[1] Fischer, Prack, Heath, Keyser, Barnes, Gamble, White, Schrader, Freeman, and Luciano (collectively, "Defendants") have moved to dismiss the Amended Complaint.[2] For the reasons stated herein, the Motion is granted in part, and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from the Amended Complaint and are accepted as true for purposes of this Motion. At the time of the events described herein, Plaintiff was an inmate at Sing Sing Correctional Facility ("Sing Sing"). (Am. Compl. 2 (Dkt. No. 25).)

#### 1. The Alleged Assault

On November 16, 2010, Plaintiff entered the B-block housing unit, from which he took his shower gear, and went to the Q-Gallery to wait in line for the "bathhouse run." (Am. Compl. ¶ 15.) By the time that Plaintiff had been waiting in line for at least 20 minutes, he asked Woody what the hold-up was. (*Id.* ¶ 16.) Woody told him that A-Block was running prisoners to the auditorium for movies. (*Id.*) Plaintiff then asked Woody if he could return to his cell, skipping

---

[1] The Amended Complaint apparently misspells Defendant William Keyser's last name as "Keysor." (Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 1 & n.1 (Dkt. No. 62).)

[2] Contradictorily, the Memorandum of Law in Support of the Motion to Dismiss both identifies Gould as one of the movants in its preliminary statement and conclusion, (*see* Defs.' Mem. 1, 14), and also says in a footnote that "Defendants do not move on behalf of . . . Gould," among others, (*id.* 1 n.2). Because the Memorandum of Law presents no arguments about why the Amended Complaint should be dismissed with respect to Gould, the Court proceeds on the assumption that she has in fact not so moved.

the bathhouse, and go to the yard when the bathhouse returned.  (*Id.*)  Woody said no, telling

Plaintiff that because he put down for the bathhouse, he had to go to it.  (*Id.*)

Ten minutes later, an announcement was made instructing all prisoners waiting for the

bathhouse run to return all cigarettes to their cells.  (*See id.*)  Plaintiff and several other prisoners

went to the back of the Q-Gallery, where Plaintiff showed Bellinger his cigarettes.  (*Id.* ¶ 17.)

Bellinger waved Plaintiff and other inmates through.  (*Id.*)  Plaintiff then returned the cigarettes

to his cell on W-Gallery.  (*Id.*)  Upon returning, Plaintiff heard Dawtin call down to Bellinger,

instructing him to stop the inmate coming off of R-Gallery, apparently in reference to Plaintiff.

(*See id.*)  Bellinger told Dawtin that Plaintiff had just returned cigarettes to his cell on W-

Gallery, but Dawtin replied that he did not call W-Gallery, telling Bellinger to send Plaintiff

back.  (*Id.*)  Plaintiff attempted to explain to Dawtin that he had been in the Q-Gallery waiting

for the bathhouse run prior to the announcement.  (*Id.*)  Dawtin cut Plaintiff off, saying that he

did not call W-Gallery, instructing Plaintiff to "take it back and lock it in."  (*Id.*)[3]

Plaintiff then proceeded back down the gallery to his cell while speaking to Bellinger,

during which time Woody sarcastically told Plaintiff that he should not have put down for the

bathhouse anyway.  (*Id.* ¶ 18.)  Plaintiff responded, saying, "no one[']s talking to you[;] mind

your fucking business."  (*Id.*)  While Plaintiff was waiting for Gould to open his cell, Plaintiff

saw Woody, Dawtin, and Bellinger approaching.  (*Id.* ¶ 19.)  Plaintiff then put his hands on the

fenced gate, but Woody said that it was "to[o] late for that" and began pushing Plaintiff back in

the direction from which he had come.  (*Id.*)  Gould stood in the middle of the W-Gallery while

Plaintiff was being pushed and shoved down the gallery.  (*Id.*)  At that time, Woody, Dawtin, and

---

[3]  Here and elsewhere, context suggests—although it is not entirely clear—that Plaintiff is
quoting one of the Defendants.

Bellinger began punching Plaintiff and striking him on the back of the head.  (*Id.*)  Plaintiff turned around and said that all of this was unnecessary.  (*Id.*)  Woody, Dawtin, and Bellinger continued throwing punches, striking Plaintiff around the face.  (*Id.*)  Plaintiff then tried to flee, but Woody grabbed him by the collar of his shirt as Bellinger and Dawtin drew their batons. (*See id.*)  Plaintiff, fearing for his life, attempted to break Woody's hold on his collar but could not.  (*Id.*)  Plaintiff, fearing further assault, attempted to defend himself successfully blocking with his arm a blow from Bellinger's baton, which Bellinger swung toward Plaintiff's head.  (*Id.*) Dawtin them rammed his baton into Plaintiff's forehead, causing Plaintiff's head to snap back and Plaintiff's shirt to rip.  (*See id.*)  As Plaintiff stumbled back, Woody struck Plaintiff on the head with his baton, causing Plaintiff to fall to the ground.  (*Id.*)  As Plaintiff tried to get up, he was repeatedly struck on the head and arms.  (*Id.*)

The attack continued until Barnes, who repeatedly ordered Woody, Dawtin, and Bellinger to stop, said, "that's enough; that's enough."  (*See id.* ¶ 20.)  During that time, Gould watched, doing nothing to stop the assault.  (*Id.*)  Plaintiff was then handcuffed, shoved down a flight of stairs, and pushed up against a wall.  (*Id.*)  Gamble shouted, "[W]hy is he still standing[?]  [W]hy is he still breathing?"  (*Id.*)  Plaintiff was then made to stand in the back of the shower, bleeding and in agonizing pain for 20 minutes before being taken to medical staff.  (*Id.*)

Plaintiff was then examined by C. Nugent ("Nugent"), a medical staff nurse, who told Plaintiff that he would be taken to an outside hospital.  (*Id.* ¶ 21.)  Schrander, Freeman, and Luciano then shackled Plaintiff and placed him in a van, where Plaintiff sat at a Sing Sing check point for several hours, during which time Plaintiff was bleeding and in excruciating pain before being taken to the Mount Vernon Emergency Room.  (*Id.*)  Once there, Plaintiff was treated and received seven sutures to close the wounds to his head.  (*Id.*)  As a result of the assault, Plaintiff

alleges that he suffered contusions as well as bleeding lacerations and abrasions on his head with swelling and abrasions to his arms and neck.  (*Id.* at unnumbered 11.)  As a result of the injuries to his head, Plaintiff was still receiving pain medication at the time of the Amended Complaint. (*Id.*)

### 2.  Proceedings Brought By And Against Plaintiff

On November 17, 2010, in what Plaintiff alleges to have been an "effort to shield the unwarranted, unprovoked assault," Plaintiff was issued two "Misbehavior Reports" dated November 16, 2010, alleging that he violated various rules of inmate behavior and charging him with two counts of violent conduct (Rule 104.11), two counts of creating a disturbance (Rule 104.13), two counts of assault on staff (Rule 100.11), "[i]nterference with [e]mployee," two counts of refusing direct orders (Rule 106.10), "[o]ut of [p]lace" (Rule 109.10), and a movement regulation violation (Rule 109.12).  (*Id.* ¶ 22.)  Lieutenant Pickens reviewed the misbehavior reports "allegedly written by [D]efendants Woody[] [and] Bellinger," and ordered Plaintiff confined to the special housing unit ("SHU").  (*Id.* ¶ 23.)

Heath designated Brereton to serve as the hearing officer, (*id.*), and, on November 21, 2010, Brereton commenced the "Tier III" hearing, in which Plaintiff entered a plea of not guilty to each of the charges.  (*Id.* ¶ 24.)  Plaintiff asked for help obtaining documents and locating and interviewing witnesses; accordingly, Brereton assigned White to assist Plaintiff.  (*Id.*)  On November 23, 2010, Brereton concluded the hearing and found Plaintiff guilty of violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), two counts of assault on staff (Rule 100.11), two counts of refusing a direct order (Rule 106.10), movement regulation (Rule 109.12), and interference with employee (Rule 107.10).  (*Id.*)  Accordingly, Brereton imposed as penalties 30

months' confinement in the SHU, 30 months' loss of packages, commissary, and phones, as well as twelve months' recommended loss of "[g]ood time." (*Id.*)

Shortly thereafter, Plaintiff sought discretionary review from Heath. (*Id.* ¶ 25.) "[S]uch review was passed along and subsequently denied." (*Id.*) On January 20, 2011, Plaintiff filed an administrative appeal, which Fischer designated Prack to review. (*Id.*) By notice dated February 14, 2011, Prack, "acting on behalf of Fischer," notified Plaintiff that the November 23, 2010 superintendent's hearing had been affirmed. (*Id.*)

On June 9, 2011, Plaintiff commenced an Article 78 proceeding, challenging the denial of his administrative appeal. (*Id.* ¶ 26.) Later, on November 9, 2011, those proceedings were transferred to the Third Department of the New York Supreme Court's Appellate Division, and Plaintiff filed his brief on January 12, 2012, which raised the same grounds as his Article 78 proceedings. (*See id.* ¶¶ 26–27.) By the time that the relief that Plaintiff had sought was granted, he had served 22 months of his 30-month penalty, and Plaintiff remained in "segregative confinement" until August 28, 2012. (*Id.* ¶ 27.)

According to Plaintiff, Brereton and White "deliberately[,] intentionally[,] and knowingly deprived [P]laintiff" of his constitutional due process rights in the context of a disciplinary proceeding by "failing to conduct a fair hearing by a neutral arbitrator," by "denying Plaintiff the right to call witnesses in support of his defense," and also by "adequate [sic] assistance[,] as well as [an] erroneously written Misbehavior Report." (*Id.* ¶ 28.) Likewise, Plaintiff alleges that Heath, Keyser, Fischer, and Prack, "upon learning of the violations[,] did allow[,] permit, approve, assist, sanction[][,] conspire[][,] or act[] in concert with [D]efendant Brereton." (*Id.* ¶ 29.)

### 3.  Allegations Concerning Particular Prison Officials' Knowledge

Plaintiff makes a few allegations related to certain Defendants' knowledge about

conditions at Sing Sing.  For example, Plaintiff alleges that Fischer, Heath, Keyser, Gamble, and

Barnes were all aware of the high volume of use of force incidents at Sing Sing, in which

officers used excessive, unnecessary force on prisoners.  (*Id.* ¶ 9).  These Defendants, Plaintiff

alleges, "failed to properly supervise and adequately train their official[s] or subordinates in the

use of force as there [are] . . . systemic, gross inadequacies in training and supervision of

officials under their control."  (*Id.*)

With respect only to Fischer, Heath, and Keyser, Plaintiff alleges that these three "failed

to ensure that their subordinates were properly and adequately trained and periodically [updated]

on the proper usage of force."  (*Id.* ¶ 13.)  Their failure to "properly screen area supervisors and

officers in conducting stress test[s] created and condone[d] the unlawful[,] unconstitutional,

[and] customary practices of excessive use of force."  (*Id.*)

Finally, Plaintiff makes certain allegations relating to Fischer and Keyser alone.  For

example, Plaintiff alleges that Fischer was "grossly negligent in supervising his subordinates

who were entrusted with the duty of ensuring their subordinates were properly or adequately

trained in the use of force."  (*Id.* ¶ 12.)  Plaintiff alleges that Fischer "had knowledge of a high

volume of excessive use of force incidents at Sing Sing, through numerous complaints," but

nevertheless "allowed the unlawful customary unconstitutional practices of excessive use [of]

force to continue by failing to act."  (*Id.*)  Additionally, Plaintiff alleges that "Fischer[] created a

policy and/or custom that allowed unnecessary excessive use of force in Sing Sing to exist by

failing [to] supervise or punish officials who failed to properly conduct fair and impartial

investigations and who themselves committed or condoned the unlawful, unconstitutional

violations." (*Id.* ¶ 14.)  Keyser, Plaintiff alleges, was "grossly negligent in supervising

subordinates who brutally, maliciously assaulted Plaintiff without provocation" and "had

knowledge of the high volume of excessive use of force incidents occurring at Sing Sing," but

nevertheless "failed to correct or remedy the wrongful unconstitutional acts committed by his

subordinates," which incidents, Plaintiff alleges, were reported to Keyser.  (*Id.* ¶ 10.)

B.  Procedural Background

On November 19, 2013, Plaintiff brought suit against Barnes, Bellinger, Brereton,

Dowtin, Fischer, Gamble, Gould, Heath, Keyser, Prack, White, Woody, and certain John Doe

defendants.  (*See* Dkt. No. 2.)  Afterwards, the Court issued an Order of Service, (Dkt. No. 5),

and Plaintiff, on March 14, 2014, filed his Amended Complaint, naming each of the currently-

named defendants "jointly, severally[,] and individually and in his/her individual and not in [his

or her] official capacity."  (Am. Compl. at unnumbered 14.)  Another Order of Service was

issued on October 7, 2014.  (Dkt. No. 45.)  On December 12, 2014, Defendants submitted a pre-

motion letter in advance of their anticipated Motion to Dismiss.  (Dkt. No. 51.)  On February 25,

2015, the Court held a Pre-Motion Conference and adopted a briefing schedule for the instant

Motion.  (Dkt. No. 56.)  Defendants filed their Motion and accompanying papers on April 22,

2015, (Dkt. Nos. 59–63), to which Plaintiff filed his Opposition on July 13, 2015, (Dkt. No. 72),

and in support of which Defendants filed their reply on August 3, 2015, (Dkt. No. 75).  In

addition, the nonmoving defendants filed their Answer on May 7, 2015, (Dkt. No. 66), to which

Plaintiff filed an "Opposition" on July 13, 2015, (Dkt. No. 71).  Plaintiff requested discovery

from Defendants on August 5, 2015, (Dkt. No. 80); however, in response to a letter motion from

the defendants, (Dkt. No. 81), the Court stayed discovery until after resolution of the pending

Motion, (Dkt. No. 82), a decision which Plaintiff asked the Court to reconsider, (Dkt. No. 83), but which the Court stood by, (Dkt. No. 84).

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss Plaintiff's Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, internal quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and, although a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"
(citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79
("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime
of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing
more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the
factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see
also Graham v. Macy's Inc.*, No. 14-CV-3192, 2015 WL 1413643, at *1 n.1 (S.D.N.Y. Mar. 23,
2015) ("For the purpose of resolving the motion to dismiss, the [c]ourt assumes all well-pled
facts to be true . . . ."). Further, "[f]or the purpose of resolving [a] motion to dismiss, the
[c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res.,
Inc.*, No. 13-CV-4384, 2014 WL 182341, at *1 n.1 (S.D.N.Y. Jan. 16, 2014) (citing *Koch v.
Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule
12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the
complaint, in documents appended to the complaint or incorporated in the complaint by
reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank
of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Hendrix v.
City of N.Y.*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

Lastly, because Plaintiff is proceeding pro se, the Court must construe his pleadings
liberally and "interpret them to raise the strongest arguments that they suggest." *Maisonet v.
Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009) (internal
quotation marks omitted); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75
(2d Cir. 2006) (same). This admonition "applies with particular force when a plaintiff's civil

rights are at issue." *Maisonet*, 640 F. Supp. 2d at 348; see also *McEachin v. McGuinnis*, 357
F.3d 197, 200 (2d Cir. 2004).  However, the liberal treatment afforded to pro se litigants does not
excuse a pro se party "from compliance with relevant rules of procedural and substantive law."
*Maisonet*, 640 F. Supp. 2d at 348 (internal quotation marks omitted).

 B.  Analysis

  1.  Fischer, Heath, and Keyser's Personal Involvement

 To begin, Defendants move to dismiss the claims against Fischer, Heath, and Keyser for
lack of personal involvement.  "It is well settled that, in order to establish a defendant's
individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's
personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*,
720 F.3d 133, 138 (2d Cir. 2013) (italics omitted); *see also Farrell v. Burke*, 449 F.3d 470, 484
(2d Cir. 2006) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a
prerequisite to an award of damages under § 1983." (internal quotation marks omitted)); *Davila
v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well
settled in this Circuit that 'personal involvement of defendants in alleged constitutional
deprivations is a prerequisite to an award of damages under § 1983.'"  (some internal quotation
marks omitted) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Lovick v. Schriro*,
No. 12-CV-7419, 2014 WL 3778184, at *3 (S.D.N.Y. July 25, 2014) (dismissing § 1983 claims
where the complaint contained "no allegations whatsoever indicating that [the defendants] were
personally involved in the purported violations" of the plaintiff's constitutional rights).
Relatedly, "[i]n an action under 42 U.S.C. § 1983, defendants cannot be held liable under a
theory of respondeat superior," *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5547277, at *7
(S.D.N.Y. Sept. 18, 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); in

other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must

plead that each Government-official defendant, through the official's own individual actions, has

violated the [law]," *Iqbal*, 556 U.S. at 676; *see also Fortunato v. Bernstein*, No. 12-CV-1630,

2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) ("Supervisory status, without more, is not

sufficient to subject a defendant to [§] 1983 liability." (internal quotation marks omitted)).

"Before *Iqbal*, the most important case in this Circuit regarding the evidence required to

establish the personal involvement of a supervisory official was *Colon v. Coughlin*, 58 F.3d 865

(2d Cir. 1995)."  *Haynes v. Mattingly*, No. 06-CV-1383, 2014 WL 4792241, at *7 (S.D.N.Y.

Sept. 24, 2014), *aff'd*, (2d Cir. Oct. 27, 2015).  Under the framework set forth in that case, courts

find personal involvement of a supervisory defendant where the plaintiff shows that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a report or appeal, failed
> to remedy the wrong, (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance of such a policy or
> custom, (4) the defendant was grossly negligent in supervising subordinates who
> committed the wrongful acts, or (5) the defendant exhibited deliberate indifference
> to the rights of inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

*Grullon*, 720 F.3d at 139 (alteration in original) (italics omitted) (quoting *Colon*, 58 F.3d at 873);

*Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting *Colon*, 58 F.3d at 873) (same).

Since then, the Second Circuit has recognized that the "[*Iqbal*] decision . . . may have heightened

the requirements for showing a supervisor's personal involvement with respect to certain

constitutional violations," *Grullon*, 720 F.3d at 139; however, "[it] has

has thus far declined to resolve the question," *Golodner v. City of New London*, No. 14-CV-173,

2015 WL 1471770, at *7 (D. Conn. Mar. 31, 2015); *see also Fortunato*, 2015 WL 5813376, at

*6 (noting that "the continuing validity of the *Colon* factors has been called into question by the

Supreme Court's ruling in *Iqbal*").  The Court need not put its oar in the water concerning the continued vitality of *Colon*, however, because Plaintiff's complaints founder even under *Colon*.

Before delving into Plaintiff's specific allusions to Fischer, Heath, and Keyser, it would likely be helpful to briefly touch upon who, exactly, these Defendants are.  First, as Plaintiff observes, Fischer was the Commissioner of the New York Department of Corrections and Community Supervision ("DOCS"), (*see* Am. Compl. ¶ 2), and the former Superintendent of Sing Sing, (*see* Opp'n to Defs.' Mot. for Summ. J. [sic] ("Pl.'s Opp'n") 4 (Dkt. No. 72)).  As has been noted in litigation, Fischer was appointed Acting Commissioner of DOCS on January 1, 2007, and was confirmed as Commissioner on March 12, 2007.  *See Rahman v. Fischer*, No. 08-CV-4368, 2010 WL 1063835, at *2 n.4 (S.D.N.Y. Mar. 22, 2010).  Also, as Plaintiff alleges, Heath was at the time of the incident the Superintendent of Sing Sing.  (Am. Compl. ¶ 3.)  Finally, as Plaintiff alleges, Keyser was the Deputy Superintendent of Security at Sing Sing.  (*Id.* ¶ 4.)

### a.  Pure Legal Conclusions

To begin, many of Plaintiff's allegations either (1) posit without explanation that incidents of officers' excessive use of force were known to Fischer, (*id.* ¶¶ 9, 12; Pl.'s Opp'n 4), Heath, (Am. Compl. ¶¶ 9, 11; Pl.'s Opp'n 4), or Keyser, (Am. Compl. ¶¶ 9, 10; Pl.'s Opp'n 4), or (2) attribute conduct to one or more of them that largely mirrors—or is at least very similar—the wording of one of the *Colon* prongs without further factual development, (Am. Compl. ¶ 10 (Keyser/prong four); *id.* ¶ 11 (Heath/prong four); *id.* ¶ 12 (Fischer/prong four); *id.* ¶ 14 (Fischer/prong three); *id.* ¶ 29 (all three/prong two); Pl.'s Opp'n 4 (all three/prong two); *id.* at 7 (all three/prong two).

With regard to the former, as the Supreme Court has made clear,

"conclusory . . . allegations" are "disentitle[d] . . . to the presumption of truth."  *Iqbal*, 556 U.S.

681; *see also Shepherd v. Fischer*, No. 10-CV-1524, 2015 WL 1246049, at *13 (N.D.N.Y. Feb.

23, 2015) (rejecting as "appear[ing] to assert a non-cognizable constitutional claim or . . . vague

and conclusory" certain claims against Fischer where the plaintiff alleged that he "[was] aware"

of certain problems at a DOCS facility (internal quotation marks omitted)), *adopted by* 2015 WL

1275298 (N.D.N.Y. Mar. 18, 2015); *Vann v. Fischer*, No. 11-CV-1958, 2012 WL 2384428, at *6

(S.D.N.Y. June 21, 2012) (dismissing claims against DOCS Commissioner for lack of personal

involvement where the plaintiff alleged that the Commissioner "ha[d] knowledge of actions

taken" (first alteration in original) (internal quotation marks omitted)).[4]  Similarly, the latter is

insufficient, as Second Circuit law has long taught that, even within the context of the *Colon*

framework, "merely recit[ing] the legal elements of a successful § 1983 claim for supervisory

liability . . . does not meet the plausibility pleading standard."  *Dotson v. Farrugia*, No. 11-CV-

1126, 2012 WL 996997, at *6 (S.D.N.Y. Mar. 26, 2012); *see also Lindsey v. Butler*, 43 F. Supp.

3d 317, 329 (S.D.N.Y. 2014) ("Conclusory accusations regarding a defendant's personal

involvement in the alleged violation, standing alone, are not sufficient . . . ." (internal quotation

marks omitted)), *reconsideration granted in part on other grounds*, No. 11-CV-9102, 2014 WL

5757448 (S.D.N.Y. Nov. 5, 2014), *reconsideration denied*, 2015 WL 1501625 (S.D.N.Y. Apr. 1,

---

[4]  Although, as acknowledged, courts have questioned the impact of *Iqbal* on the *Colon* factors, they have done so in the context of considering *Iqbal*'s proscription of respondeat superior liability in § 1983 and *Bivens* suits.  *See, e.g.*, *Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012) (noting that "*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*" after describing *Iqbal*'s holding as to vicarious liability (citing *Iqbal*, 556 U.S. at 676–77)).  There is no question that *Iqbal*'s other holdings—for instance, its clarification that a court need not accept legal conclusions as true when faced with a motion to dismiss, *see Iqbal*, 556 U.S. at 678—apply with no less force in a *Colon* analysis than in any other area of law.

14

2015); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) ("To the extent [the

plaintiff] may argue that [two of the defendants] failed to properly supervise subordinates who

were violating her rights, the mere fact that a defendant possesses supervisory authority is

insufficient to demonstrate liability for failure to supervise under § 1983." (internal quotation

marks omitted)).  Thus, to the extent that Plaintiff's allegations contravene these rules, they

cannot make out a claim of personal involvement.

### b.  Receipt of Reports

Additionally, Plaintiff alleges that reports of excessive force—either from other inmates

or DOCS' reporting system—were made to Fischer, (Am. Compl. ¶ 12; Pl.'s Opp'n 3–4), Heath,

(Am. Compl. ¶ 11; Pl.'s Opp'n 3–4), and Keyser, (Am. Compl. ¶ 10; Pl.'s Opp'n 3–4).  Ample

Second Circuit case law makes clear that a plaintiff does not state a claim where he alleges only

that a supervisory official received reports of wrongdoing.  *See Pagan v. Westchester Cty.*, No.

12-CV-7669, 2014 WL 982876, at *22 (S.D.N.Y. Mar. 12, 2014) (noting in the context of a

claim against the commissioner of Westchester County Department of Corrections that

"[e]vidence of notification, via letters or complaints, of an unconstitutional condition is alone not

sufficient to indicate that a defendant is personally involved in the unconstitutional conduct"),

*reconsideration granted on other grounds*, 2015 WL 337403 (S.D.N.Y. Jan. 26, 2015); *Hobson

v. Fischer*, No. 10-CV-5512, 2011 WL 891314, at *4–5 (S.D.N.Y. Mar. 14, 2011) (dismissing

Fischer from lawsuit for lack of personal involvement where the plaintiff "[did] not allege that

Fischer personally participated in the denial of [the plaintiff's] grievances" and "[did] not

elaborate as to how Fischer knew about the alleged violations," but "argue[d] that Fischer knew

or sh[o]uld have known, of the alleged constitutional violations as the Commissioner of DOCS

and the former Superintendent of Sing Sing"); *Rahman*, 2010 WL 1063835, at *5 (dismissing

excessive force claims brought against two deputy DOCS commissioners for lack of personal involvement reasoning as to one that the allegation that he "received 'several' complaints of staff assaulting prisoners" is "insufficient allegation of notice of any policy or custom of assaults by corrections officers," and noting, as to the other, that allegations against him rested, in part, "on complaints sent to his office" but that "[t]his is not a sufficient allegation of personal involvement"); *Voorhees v. Goord*, No. 05-CV-1407, 2006 WL 1888638, at *5–6 (S.D.N.Y. 2006) (finding alleged receipt of some 60 grievances relating to prison official by then-Commissioner Glenn Goord insufficient to establish Goord's personal involvement); *cf. Gillard v. Rovelli*, No. 12-CV-83, 2014 WL 4060025, at *10 (N.D.N.Y. Aug. 14, 2014) (noting that the plaintiff "contend[ed] that [the deputy superintendent for security] was advised of . . . ongoing threats made by [a corrections officer]," but observing that "[the plaintiff] [did] not allege how and when [the deputy superintendent] was advised of such threats").  This is arguably consistent with the oft-repeated logic of the Second Circuit that "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim," *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)), and that "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a plaintiff's] claim," *Colon*, 58 F.3d at 874.

Of course, these cases should not be taken to state more than they do.  While receiving reports of excessive force does not, without more, save a seat at the defense table for DOCS commissioners, prison superintendents, or a deputy superintendent for security, the receipt of such reports is certainly not inconsistent with personal involvement.  Therefore, to the extent that Plaintiff can offer additional factual details concerning Fischer's, Heath's, or Keyser's

involvement in his alleged constitutional harms, he should do so in a Second Amended Complaint.  *See Pagan*, 2014 WL 982876, at *22 (declining to dismiss claims against the Commissioner of the Westchester County Department of Corrections on the grounds that the "plaintiffs allege[d] more than mere notification through written correspondence," further "claim[ing] that [the commissioner] had daily meetings with the senior members of his staff, during which he was made aware of these ongoing issues" and that, despite these meetings, the commissioner persisted in ignoring the violations); *Rahman v. Fisher*, 607 F. Supp. 2d 580, 586 (S.D.N.Y. 2009) ("To the extent that [the] plaintiff is able to plead that a pattern of assaults by guards existed prior to [the date of the plaintiff's alleged assault] that did or should have put supervisory defendants on notice of a condition that left unaddressed could be reasonably expected to result in an assault on an inmate such as [the plaintiff], then he may be able to state a claim for supervisory liability against such defendants.").

### c.  Failure To Train

Plaintiff also alleges that Fischer, Heath, Keyser, or some combination thereof failed to adequately train or supervise subordinates.  (*See* Am. Compl. ¶¶ 2–4, 9–13).[5]  An allegation that a defendant failed to adequately train or supervise subordinates implicates the fourth *Colon*

---

[5] Of course, an allegation that one of these Defendants was grossly negligent in supervising subordinates—which Plaintiff does allege in that manner, (*see, e.g.*, Am. Compl. ¶ 10)—runs headlong into the rule discussed earlier that mere recital of the *Colon* prongs does not establish personal involvement.  (*See supra* section II(B)(1)(a).)

Additionally, in one obscure allegation, Plaintiff asserts that "[t]he failure of Key[s]er, [H]eath[,] and Fischer to properly screen area supervisors and officers in conducting stress test [sic] created and condone[d] the unlawful unconstitutional, customary practices of excessive use of force."  (Am. Compl. ¶ 13.)  In so saying, the Court believes that Plaintiff is further alleging supervisory failures on these three Defendants' part, but, candidly, the Court is not certain. Should Plaintiff elect to submit an Amended Complaint, if he has specific allegations to make concerning these Defendants' role in a prison stress test, he should include them.

factor, i.e., that "the defendant was grossly negligent in supervising subordinates who committed

the wrongful acts." *Colon*, 58 F.3d at 873.  However, to establish personal involvement on that

basis

> Plaintiff must show that [the defendant] "knew or should have known that there
> was a high degree of risk that his subordinates would behave inappropriately, but
> either deliberately or recklessly disregarded that risk by failing to take action that a
> reasonable supervisor would find necessary to prevent such a risk, and that failure
> caused a constitutional injury to Plaintiff."

*Frederick v. Sheahan*, No. 10-CV-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014)

(alterations omitted) (quoting *Poe v. Leonard*, 282 F.3d 123, 142 (2d Cir. 2002)); *see also*

*Kucera v. Tkac*, No. 12-CV-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013) (noting an

"alleged failure [to supervise or train] [would] satisfy the fourth *Colon* factor if [the officers]

'knew or should have known that there was a high degree of risk that subordinates would behave

inappropriately but either deliberately or recklessly disregarded that risk by failing to take action

that a reasonable officer would find necessary to prevent such a risk.'" (alterations omitted)

(quoting *Poe*, 282 F.3d at 142)).  A general allegation that Fischer, Heath, and/or Keyser failed

to train subordinates, however, is insufficient to establish personal involvement, absent some

factual connection between their failure to train and the harm that eventually befell Plaintiff.

*See, e.g.*, *McRae v. Gentile*, No. 14-CV-783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015)

(finding no personal involvement by prison superintendent where the plaintiff alleged that the

"[superintendent's] negligent training and supervision of the [d]efendant [c]orrections [o]fficers

caused the Plaintiff's injuries" but "provide[d] no facts to support [the superintendent's] personal

involvement in the alleged assault," reasoning that "[v]ague and conclusory allegations that a

supervisor negligently failed to train or supervise subordinate employees are not sufficient to

establish personal involvement so as to give rise to personal liability." (internal quotation marks

omitted)), *adopted by* 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015); *Shepherd*, 2015 WL

1246049, at *13 (rejecting as too conclusory or otherwise non-cognizable the assertion that Fischer and two superintendent defendants, "acting alone and/or in conjunction with each other[,] were aware of there being a systematic, gross inadequacies in training as well [as] supervision of subordinates in the use of force, and further failed to take corrective as well as preventative measures, which caused the violation of [the] plaintiff's rights." (first alteration in original) (internal quotation marks omitted)); *McKenna v. Wright*, No. 01-CV-6571, 2004 WL 102752, at *5 (S.D.N.Y. Jan. 21, 2004) (concluding that the "plaintiff's position that [the DOCS commissioner] [was] personally liable for 'his failure to ensure' [an associate commissioner's sufficient resolution of the plaintiff's grievance], is merely an end-run around the legal standard and fails to establish [the commissioner's] personal involvement," and concluding that, "[b]ecause [the] plaintiff makes no further allegations as to [the commissioner's] involvement, [the] plaintiff's claims against [the commissioner] are dismissed"); *Pacheco v. Fischer*, No. 09-CV-614, 2011 WL 831524, at *2 (N.D.N.Y. Jan. 19, 2011) ("[The] [p]laintiff's conclusory allegations that defendant Fischer failed to properly train staff and supervise employees at one of the many facilities in his Department [are] not enough to establish his personal involvement in the violations alleged by [the] plaintiff"), *adopted by*, 2011 WL 830266 (N.D.N.Y. Mar. 3, 2011); *cf. Pettus v. Morgenthau*, 554 F.3d 293, 299–300 (2d Cir. 2009) (concluding that, "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim . . . , it lacks any hint that [the DOCS commissioner] acted with deliberate indifference to the possibility that his subordinates would violate [the plaintiff's] constitutional rights" where the complaint alleged that the DOCS commissioner was responsible for "the hiring, practices, policies, customs, screening, training, supervising, controlling and disciplining" of DOCS employees).  Here, Plaintiff's allegations that Fischer, Heath, and Keyser failed to adequately train their

19

subordinates—at least as currently stated—are too conclusory to pass muster. To the extent that Plaintiff is able to make factual allegations connecting Fischer's, Heath's, and Keyser's putative failure to adequately train and supervise their employees with the injuries Plaintiff sustained, he should do so in his Second Amended Complaint.

### d.  Statement During Orientation

In an interesting allegation, Plaintiff asserts that "Heath acknowledged the fact that his officer[]s were corrupt given his statement during orientation at Sing Sing," which statement, Plaintiff says, was "an indication of [Heath's] actual knowledge of pattern of unconstitutional practices at the facility." (Pl.'s Opp'n 4.) Unlike many of the other allegations in the Amended Complaint, this is not wholly conclusory; to the contrary, it is a specific reference to a specific statement by a specific Defendant, which, Plaintiff seems to suggest, demonstrates that Heath knew unconstitutional practices were afoot. Nevertheless, it too comes up short, because, in its current form, there is nothing to suggest one way or the other that the allegedly "unconstitutional practices" of which Heath was aware were the same as those alleged in Plaintiff's Amended Complaint. *Cf. Voorhees*, 2006 WL 1888638, at *5–6 (finding no personal involvement by DOCS commissioner in lawsuit bringing excessive force claim where there were allegedly more than 60 grievances filed on a prison employee, reasoning that "[i]nmates and staff could have complained to [the commissioner] about all manner of alleged shortcomings in [the employee's] performance, including being rude, verbally abusive, irrational[,] or even engaging in minor acts of physical abuse such as shoving or pushing inmates"). To the extent that Plaintiff is able to allege facts demonstrating that Heath knew that unconstitutional practices like those alleged in this case were occurring, he should do so in a Second Amended Complaint.

e.  Referral of Appeals

Plaintiff also alleges that he "sought discretionary review [of his Tier III hearing] from Heath," which was "passed along and subsequently denied," and that, "[o]n January 20, 2011, [P]laintiff filed his administrative appeal contesting the erroneous determination of Brereton raising a number of grounds for relief" and that "Fischer[] designated Prack[] to review Plaintiff's administrative appeal."  (Am. Compl. ¶ 25.)[6]  These allegations, however, are not enough because case law makes clear that a prison official's personal involvement does not spring into being simply because an appeal, which he delegates to another, was originally directed to him.  *See Kasiem v. Rivera*, No. 09-CV-9665, 2011 WL 166929, at *5 (S.D.N.Y. Jan. 18, 2011) ("To the extent that [the plaintiff's] claims rest on allegations that [two prison supervisors] referred his complaints/appeals to others for investigation and that they were the supervising officers for defendants who violated his rights, those claims must be dismissed for failure to allege personal involvement in the violation of the plaintiff's rights."); *cf. Koehl v. Bernstein*, No. 10-CV-3808, 2011 WL 2436817, at *10 (S.D.N.Y. June 17, 2011) (noting that the second *Colon* category does not apply to prison official whose only opportunity to rectify due process violation in tier III proceedings was through appeal because "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under [§] 1983." (internal quotation marks omitted)), *adopted by* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *Foreman v. Goord*, No. 02-CV-7089, 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the superintendent] affirmed the denial

---

[6] Keyser's involvement in this appeals process, which is unclear from these allegations, will be discussed later.  (*See infra* section II(B)(2)(a).)

of [the] plaintiff's grievances is insufficient to establish personal involvement.").[7]  Here, because

Plaintiff seems to allege that Heath and Fischer merely passed along their appeals for others to

consider, he has not adequately alleged their personal involvement.[8]

### 2. Failure to State a Claim

Additionally, Defendants move to dismiss the claims against them for failure to state a

claim on various grounds.  (*See* Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.'

Mem.") 8–11 (Dkt. No. 62).)

---

[7]  As will be discussed later, "there is an apparent split in the Circuit as to whether the affirmance of disciplinary hearing disposition is sufficient to establish personal involvement." *Brown v. Brun*, No. 10-CV-397, 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010).  Although the Court respectfully questions the proposition that affirming an unconstitutional disposition is insufficient to establish personal involvement, it nevertheless believes the logic underlying decisions coming to the opposite conclusion demonstrates that simply *referring* a case for a determination is not enough.

[8]  To be sure, the second *Colon* prong indicates that personal involvement may be found where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong."  *Colon*, 58 F.3d at 873.  And, indeed, "there is some authority for the proposition that, where a defendant is in a position to remedy an 'ongoing' constitutional violation but fails to do so, he or she can be held liable under [§] 1983" in such cases.  *Blalock v. Jacobsen*, No. 13-CV-8332, 2014 WL 5324326, at *10 (S.D.N.Y. Oct. 20, 2014); *see also Zappulla v. Fischer*, No. 11-CV-6733, 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013) ("[I]f a plaintiff alleges that a constitutional violation is ongoing, and that a defendant, after being informed of a violation through a report or appeal, failed to remedy the wrong, the plaintiff's claim against that defendant should not dismissed under Rule 12(b)(6).").  To the extent that this doctrine accurately states the law, it is not clear that Plaintiff's appeal relating to the alleged use of excessive force put Fischer and Heath on notice of an *ongoing* violation.  *See Smith v. Wildermuth*, No. 11-CV-241, 2013 WL 877399, at *9 (N.D.N.Y. Jan. 24, 2013) (applying ongoing violation doctrine and finding no personal involvement on the part of the prison superintendent in a case (1) where the plaintiff alleged (a) that prison officials attacked him, (b) that the officials filed false incident reports to cover up their attack, and (c) that an inmate was beaten by a guard every month since the superintendent took over; and (2) where the superintendent denied the plaintiff's grievance regarding the alleged use of excessive force, reasoning that "[the superintendent] denied [the] [p]laintiff's grievance about a one-time event"), *adopted by* 2013 WL 877512 (N.D.N.Y. Mar. 11, 2013).

### a.  Due Process Claims

Defendants move to dismiss Plaintiff's due process claims against Prack and White.  (*Id.* 9.) [9]  "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process."  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (alteration in original) (internal quotation marks omitted).  The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment).  However, the Supreme Court has also held that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) (same).  The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test."  *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (internal quotation marks omitted).  The duration of confinement, however, is "not the only relevant factor," as the Second Circuit has

---

[9]  In his Opposition, Plaintiff indicates that "Keyser . . . reviewed the hearing proceeding and determined that [it] complied with the Procedures for Implementing Standards of Inmate behavior Chapter V, Title 7 N.Y.C.R.R. . . . ."  (Pl.'s Opp'n 7.)  Plaintiff additionally attaches an exhibit reflecting the outcome of Plaintiff's Tier III disciplinary proceedings, with a stamp on it that reads "I have reviewed this hearing and find that it complies with Chapter V Title 7 of N.Y.C.R.R." and is apparently signed by Keyser.  (*Id.* Ex. D.)  Plaintiff's only reference to Keyser in this regard in his Amended Complaint is the assertion that he "subsequently determined the Tier III hearing complies with the provisions of Chapter V Title 7 of N.Y.C.R.R." (Am. Compl. ¶ 4.)  While it is not clear that Defendants seek dismissal of Keyser on the same grounds as Prack, perhaps because they did not read this line as endeavoring to state a claim against Keyser on this basis, dismissal would nevertheless be inappropriate for the same reasons as with Prack.

"explicitly avoided a bright line rule that a certain period of [Solitary Housing Unit ('SHU')] confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (internal quotation marks omitted).  Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions."  *Id.* (internal quotation marks omitted); *see also Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.").  Nevertheless, "[a] confinement longer than an intermediate one [i.e., 101 and 305 days], and normal SHU conditions, is a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*."  *Palmer*, 364 F.3d at 65 (internal quotation marks omitted); *see also Gonzalez v. Hasty*, 802 F.3d 212, 223 (2d Cir. 2015) ("A period of confinement under typical SHU conditions lasting longer than 305 days . . . triggers a protected liberty interest . . . .").  Significantly, the Second Circuit has cautioned that "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions."  *Palmer*, 364 F.3d at 65–66; *see also Houston*, 7 F. Supp. 3d at 298 (same).

Given Plaintiff's allegation that he was initially sentenced to 30 *months* in the SHU— which is, to risk stating the obvious, considerably longer than 30 days—this Court is not prepared to rule as a matter of law that he could not state a due process claim.  *See Palmer*, 364

24

F.3d at 65–66.  This is quite likely unsurprising, as Plaintiff alleges that it was Brereton who

commenced the Tier III hearing, (Am. Compl. ¶ 24), but certain named defendants, including

Brereton, do not seek dismissal because "Plaintiff's allegations seem to raise issues that cannot

be resolved in a motion to dismiss," (Defs.' Mem. 1 n.2).  The remaining questions, then, are (1)

whether a prison official who affirms a disciplinary determination is sufficiently involved to

make out a due process claim, and (2) whether an "employee assistant" can be held liable for a

due process violation.[10]

### i.  Appeals Claim (Prack and Keyser)

Interestingly, "[c]ourts within the Second Circuit are split over whether . . . an allegation

[that a defendant affirmed a disciplinary proceeding] is sufficient to establish personal liability

for supervisory officials."  *Scott v. Frederick*, No. 13-CV-605, 2015 WL 127864, at *17

(N.D.N.Y. Jan. 8, 2015).  On the one hand, some courts have concluded that merely affirming a

disciplinary proceeding is not enough to create personal involvement, while others have

determined that it is.  *Compare id.* ("We subscribe to the affirmance-plus standard, which holds

that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege

personal involvement."); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *17

(N.D.N.Y. Sept. 11, 2014) ("Courts within the Second Circuit are split over whether the mere

allegation that a supervisory official affirmed a disciplinary determination is sufficient to

---

[10]  Defendants do not cast the former issue as one of personal involvement, but the case
law makes clear that that is the concern animating the debate.  *See Jackson v. Bradt*, No. 13-CV-
4, 2014 WL 2505218, at *4 (W.D.N.Y. May 29, 2014) (noting that "the only allegation [against
Prack] is that he affirmed [a lieutenant's] disposition" in a disciplinary proceeding, which is,
"alone[,] . . . insufficient to state a claim against Prack" and citing another case which, in part,
endorsed the proposition that "personal involvement cannot be founded solely on supervision,
liability can be found if the official proactively participated in reviewing the administrative
appeals" (internal quotation marks omitted)).

25

establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement."); *and Brown v. Brun*, No. 10-CV-397, 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (noting that "there is an apparent split in the Circuit as to whether the affirmance of disciplinary hearing disposition is sufficient to establish personal involvement," and concluding that "[t]he distinction . . . appears to be that while personal involvement cannot be founded solely on supervision, liability can be found if the official proa[c]tively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results" (internal quotation marks omitted)) *with Tolliver v. Lilley*, No. 12-CV-971, 2014 WL 10447163, at *12 (S.D.N.Y. Oct. 24, 2014) ("Prack received [the plaintiff's] grievance, reviewed it and acted on it, personally.  Accordingly, the allegations against Prack are sufficient to state personal involvement and dismissing the claims against him based on this ground is not warranted . . . ."), *adopted sub nom. Tolliver v. Skinner*, No. 12-CV-971, 2015 WL 5660440 (S.D.N.Y. Sept. 25, 2015); *Murray v. Arquitt*, No. 10-CV-1440, 2014 WL 4676569, at *12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement."); *and Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ("[I]t cannot be said that the *Iqbal* holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of Plaintiff[']s due process rights, thus continuing a deprivation of liberty without due process of law").

The Court thinks the better view is that an affirmance of an unconstitutional disciplinary proceeding can be sufficient to find personal involvement.  This is so for several reasons.  First, on a simple conceptual level, it is difficult to imagine how a prison official could be deemed

uninvolved where that official considered the inmate's objections and had the power to abrogate or preserve punishment, that, allegedly, was improperly imposed. *Cf. Tolliver*, 2014 WL 10447163, at *12 (finding personal involvement where a prison official "reviewed" and "acted on" an inmate's grievance). Second, the Court does not think there is any tension between such a determination and *Iqbal*, the relevant teaching of which was that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Third, if *Colon* indeed survived *Iqbal*, the Court finds it telling that the Second Circuit held that personal involvement could be found where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," without further clarifying that "fail[ing] to remedy the wrong," is not enough where the defendant also affirmed the decision. *See Colon*, 58 F.3d at 873. Therefore, the Court declines to dismiss the claims against Prack and Keyser for failure to state a claim due to lack of personal involvement.

### ii.  Employee Assistant Claim (White)

Defendants argue that the claim against White should be dismissed because "[a]n employee assistant in a prison disciplinary hearing has been described as 'merely a surrogate for the inmate, not a legal adviser or advocate' and a claim of inadequate assistance fails to state a constitutional claim." (Defs.' Mem. 9 (quoting *Dawes v. Carpenter*, 899 F. Supp. 892, 896 (N.D.N.Y. 1995)). Even if that job description is apt, the lesson Defendants draw from it is not.

The Second Circuit has recognized that "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988); *see also Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) ("The Supreme Court has recognized institutional concerns that in general bar an inmate from obtaining counsel. We have held,

however, that in certain circumstances an inmate will be unable to 'marshal evidence and present a defense,' without some assistance." (citations omitted) (quoting *Eng*, 858 F.2d at 898) (citing *Wolff*, 418 U.S. at 570)); *Gonzalez v. Chalk*, No. 13-CV-5486, 2014 WL 1316557, at *4 (S.D.N.Y. Apr. 1, 2014) ("[U]nder certain circumstances including the confinement of the inmate in the SHU, the inmate has a right to assistance in marshalling evidence and preparing a defense."  (citing *Eng*, 858 F.2d at 897–98)); *Peralta v. Vasquez*, No. 01-CV-3171, 2010 WL 391839, at *3 (S.D.N.Y. Feb. 4, 2010) ("While there is no right to counsel, prison officials have a constitutional obligation to provide assistance to an inmate 'in marshaling evidence and presenting a defense when he is faced with disciplinary charges.'" (quoting *Eng*, 858 F.2d at 897)), *aff'd sub nom. Peralta v. Goord*, 402 F. App'x 594 (2d Cir. 2010).  Accordingly, New York's regulations provide when an inmate is entitled to an employee assistant under certain circumstances, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 251-4.1, and describe the scope of that assistant's obligations, *see id.* § 251-4.2; *see also Moore v. Peters*, 92 F. Supp. 3d 109, 126 (W.D.N.Y. 2015) ("New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing."  (citing N.Y. Comp. Codes R. & Regs. tit. 7, §§ 251-4.1, 251-4.2)); *see also LeBron v. Artus*, No. 06-CV-532, 2008 WL 111194, at *8 (W.D.N.Y. Jan. 9, 2008) (same).  An employee assistant is "not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled;" rather, the assistant is "to act as [the inmate's] surrogate."  *Silva*, 992 F.2d at 22 (emphasis omitted).  Additionally, "any violations of this qualified right [to employee assistance] are reviewed for 'harmless error.'"  *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009).

In his Opposition to Defendants' Motion, Plaintiff elaborates on White's assistance, alleging that:

> Plaintiff met with White in SHU and requested that he interview Gould, B[e]llinger, Dowtin[,] Woody, Barnes and inmate[] witnesses located in B-Block on (W) Whiskey gallery and obtain photos and documents generated as a result of the incident i.e. Use of force; To-from; Unusual incident; Investigative reports; Logbook entries (from specific locations), photos of injuries or other[]wise . . . . White returned and read a document that reiterated what was written in the Misbehavior Reports and told [P]laintiff he could not have it, but gave Plaintiff a B-Block Logbook entry and showed him a witness list.
>
> White[] failed to provide adequate assistance by failing to interview actual witnesses, provide requested documents and photos . . . . White provided no relevant documents and clearly failed to interview witnesses given the fact no notes were provided of an interview with inmates or officers and all prisoner[]s testified to being in the prison yard when Plaintiff was assaulted, except one inmate.

(Pl.'s Opp'n 8–9.)[11]  In response, Defendants argue that (1) despite Plaintiff's "elaboration" in his Opposition papers, he provides "no facts to support [his] allegations" concerning White, such that they are "essentially conclusory," and (2) that "[P]laintiff does not claim that *no* assistance was given, but rather that the assistance was inadequate" and that "[s]uch a claim of inadequate assistance generally does not rise to a constitutional violation."  (Defs.' Reply Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Reply") 7 (Dkt. No. 75) (emphasis added).)

---

[11]  In resolving the instant Motion, it is appropriate to consider allegations contained in Plaintiff's Opposition.  *See Anderson v. Buie*, No. 12-CV-6039, 2015 WL 9460146, at *13 (W.D.N.Y. Dec. 23, 2015) (liberally construing the pro se plaintiff's submissions to consider a document referred to repeatedly in opposition to motion to dismiss); *Elliott v. Nestle Waters N. Am. Inc.*, No. 13-CV-6331, 2014 WL 1795297, at *7 (S.D.N.Y. May 6, 2014) (considering, among other things, an exhibit attached to an opposition brief in part "in light of the policy permitting courts to consider facts alleged for the first time in a pro se plaintiff's opposition to a motion to dismiss"); *Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 246–47 (S.D.N.Y. 1998) ("Although material outside a complaint generally is not to be taken into consideration on a motion to dismiss, the policy reasons favoring liberal construction of pro se complaints permit a court to consider allegations of a pro se plaintiff in opposition papers on a motion where . . . consistent with the complaint.").

Plaintiff has alleged sufficient facts to state a claim against White.  Read liberally, Plaintiff's opposition alleges that he asked White to obtain certain documents and to interview certain witnesses, but that White failed to do so without explanation.  Although an inmate's "right to assistance" may not always "translate to a wholesale right to receive all of the documentary evidence requested," *Scott*, 2015 WL 127864, at *11, Plaintiff's specific allegations about White's failures are nevertheless sufficient to state a claim against him, *see Brooks v. Prack*, 77 F. Supp. 3d 301, 316 (W.D.N.Y. 2014) (finding that the plaintiff stated a claim against his employee assistant where, inter alia, "[the] [p]laintiff . . . identified specific documents that he requested [the employee assistant] deliver to him but that he never received"); *Cepeda v. Urban*, No. 12-CV-408, 2014 WL 2587746, at *7 (W.D.N.Y. June 10, 2014) (declining to dismiss claim against employee assistant where "[the] [p]laintiff allege[d] he was essentially denied an inmate assistant in connection with the disciplinary hearing because [the employee assistant], who was assigned to assist [the] [p]laintiff, failed to interview the witnesses identified by [the] [p]laintiff or to retrieve any of the documents [the] [p]laintiff had requested"); *Friedland v. Otero*, No. 11-CV-606, 2014 WL 1247992, at *7 (D. Conn. Mar. 25, 2014) (denying summary judgment on procedural due process claim where "there [was] conflicting evidence as to whether [the plaintiff] asked [his employee assistant] to secure witness testimony or statements to be submitted at the hearing and whether the lack of access to these statements or testimony deprived [the] [p]laintiff of the opportunity to marshal evidence and present a defense").  Therefore, Plaintiff's claims against White are not dismissed.

### b.  Eighth Amendment Claims

The Eighth Amendment to the Constitution proscribes "cruel and unusual punishments." Plaintiff brings two distinct sets of Eighth Amendment claims against various Defendants, one

against prison officials for their conduct during Plaintiff's alleged beating at the hands of other officers, and one relating to the delay in taking Plaintiff to the emergency room.  (*See* Am. Compl. ¶¶ 20–21.)  The Court will address each in turn.

### i.  Claims against Gamble and Barnes

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of inmates in their custody."  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see also McRae*, 2015 WL 7292875, at *2 (same).  Moreover, "[l]aw enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence."  *McRae*, 2015 WL 7292875, at *2 (citing, inter alia, *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."); *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *8 (S.D.N.Y. Dec. 5, 2011) ("A law enforcement officer 'has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.'" (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997))); *Tavares v. City of N.Y.*, No. 08-CV-3782, 2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011) ("A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." (internal quotation marks omitted) (quoting *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir. 1988))), *adopted by*, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011).  Specifically, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other

officers where that officer observes or has reason to know that excessive force is being used,"
provided there was "a realistic opportunity to intervene to prevent the harm from occurring."
*Rahman*, 2011 WL 6028212, at *8 (ellipses and internal quotation marks omitted) (quoting
*Anderson*, 17 F.3d at 557); *see also Curley*, 268 F.3d at 72 ("Failure to intercede results in
liability where an officer observes excessive force is being used or has reason to know that it will
be." (citing *Anderson,* 17 F.3d at 557)); *Tavares*, 2011 WL 5877550, at *7 ("An officer who fails
to intercede is liable for the preventable harm caused by the actions of the other officers where
that officer observes or has reason to know that excessive force is being used, or that any
constitutional violation has been committed by a law enforcement official." (alterations and
ellipses omitted) (quoting *Anderson*, 17 F.3d at 557)); *Jean-Laurent v. Wilkerson*, 438 F. Supp.
2d 318, 327 (S.D.N.Y. 2006) ("Liability will attach only when (1) the officer had a realistic
opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position
would know that the victim's constitutional rights were being violated; and (3) the officer does
not take reasonable steps to intervene."), *aff'd*, 461 F. App'x 18 (2d Cir. 2012).

     Here, Plaintiff alleges that, in the course of his assault, he was "handcuffed[,] . . . shoved
down a flight of stairs[,] and pushed up against a wall w[h]ere . . . Gamble shouted [']why is he
still standing[?]  [W]hy is he still breathing[?][']"  (Am. Compl. ¶ 20.)  Defendants, however,
argue that this fails to state a claim because "[e]ven vile and abusive language . . . [,] no matter
how abhorrent or reprehensible, cannot form the basis for a § 1983 claim."  (Defs.' Mem. 10
(ellipses in original) (internal quotation marks omitted) (quoting *Harris v. Fischer*, No. 11-CV-
6260, 2014 U.S. Dist. LEXIS 107503, at *46 (S.D.N.Y. Aug. 1, 2014).)  True though this
proposition may be, it of course cannot be stretched to insulate an officer from § 1983 liability
that he would otherwise have faced had he instead stood silent during an assault by his

coworkers.  Perhaps recognizing the conceptual distinction between Gamble's words judged by their content and the same words—to borrow a phrase from evidence law—as a verbal act, Defendants argue that, unlike the cases Plaintiff cites to show that an official who intends to incite unconstitutional conduct by his statements may be held liable for a constitutional violation, Gamble "made the statement after the alleged incident."  (Defs.' Reply 8.)  Such a distinction is, however, too flimsy for two reasons.  First, it not completely clear from the Amended Complaint—particularly when read with an accommodating eye on Plaintiff's pro se status—that Plaintiff really does allege, as Defendants say, that Gamble made his statement after the assault concluded.  *See Triestman*, 470 F.3d at 476.  (*See also* Am. Compl. ¶ 20.)  Second, the dispositive question is not when Gamble made his statement; rather, it is whether he had reason to know of the use of force and a reasonable opportunity to prevent the harm.  *See Rahman*, 2011 WL 6028212, at *8.  Even if Gamble made the statement in question after the assault, it would be perfectly plausible that he did so having already seen the assault and having already made up his mind not to stop it.  Therefore, the Court cannot say that the facts, as alleged, make an Eighth Amendment claim against Gamble implausible.

The story is different with respect to Barnes, however.  As to Barnes, Plaintiff alleges only that he "repeatedly ordered [the] [D]efendants [who were beating Plaintiff] to stop" and "stat[ed][,] [']that[']s enough[;] that[']s enough.[']"  (Am. Comp. ¶ 20.)  This, of course, falls far short of alleging that Barnes had reason to know that excessive force was being used and had a realistic opportunity to intervene to prevent the harm from occurring.  *See Rahman*, 2011 WL 6028212, at *8.  There is simply no reason—in the absence of allegations to the contrary—to believe that Barnes saw the assault, declined to prevent it, had a road-to-Damascus moment, and,

then, at least verbally tried to stop the assault.  Therefore, the claims against Barnes are dismissed without prejudice.

The Court is concerned, however, that Plaintiff may not have fully understood that Defendants sought dismissal of the claims against Barnes because the section of Defendants' Memorandum dealing with Barnes also sought dismissal of claims against Fischer, Heath, Keyser, Prack, Barnes, White, Gamble, Schrader, Freeman, and Luciano, and included for each of those Defendants a subheading identifying them by name and presenting arguments specific to why the claims should be dismissed against that Defendant (sometimes along with two others). (*See* Defs.' Mem. 8–11.)  In contrast, the only time that Barnes is mentioned in the argument section of the brief is (1) a footnote in a separate, earlier section otherwise dealing *only* with Fischer, Heath, and Keyser, (*see id.* at 6 n.4), and (2) in an introductory sentence with accompanying heading and conclusion sentence saying that Plaintiff failed to state a claim against Barnes but not explaining why, (*see id.* 8, 11.)  Moreover, Plaintiff, in contrast to his approach with respect to the other Defendants in Barnes's section, did not present any arguments as to why he stated a claim against Barnes.  (*See generally* Pl.'s Opp'n.)  In the future, the Court hopes that counsel for Defendants will structure their briefs in such a way as to minimize the risk that a pro se party like Plaintiff will not have to struggle to determine the full scope of their arguments.  In the meantime, Plaintiff will have an opportunity to re-visit his claims against Barnes if he wants to further amend his complaint.

### ii.  Claims against Schrader, Freeman, and Luciano

The Amended Complaint also alleges that Schrader, Freeman, and Luciano violated Plaintiff's Eighth Amendment rights by leaving him shackled in a van at a check point while he

was in excruciating pain for several hours before taking him to the emergency room.  (Am.
Compl. ¶ 21.)

"The Eighth Amendment forbids deliberate indifference to serious medical needs of
prisoners."  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)
(internal quotation marks omitted).  "The Supreme Court has held that an officer's 'deliberate
indifference to serious medical needs of prisoners constitutes the unnecessary and wanton
infliction of pain proscribed by the Eighth Amendment.'"  *Kennedy v. City of N.Y.*, No. 12-CV-
4166, 2015 WL 6442237, at *14 (S.D.N.Y. Oct. 23, 2015) (quoting *Estelle v. Gamble*, 429 U.S.
97, 104 (1976)).  "[S]uch indifference may be manifested through the intentional denial of a
prisoner's access to medical care . . . ."  *Id.* (citing *Estelle*, 429 U.S. at 104); *see also Quezada v.
Roy*, No. 14-CV-4056, 2015 WL 5970355, at *18 (S.D.N.Y. Oct. 13, 2015) ("Prison officials
violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical
needs by denying or delaying his access to medical care or by intentionally interfering with his
treatment." (internal quotation marks omitted)).  "There are two elements to a claim of deliberate
indifference to a serious medical condition."  *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir.
2009).  "The first requirement is objective:  the alleged deprivation of adequate medical care
must be sufficiently serious."  *Spavone*, 719 F.3d at 138 (internal quotation marks omitted).
Analyzing this objective requirement requires two inquiries.  "The first inquiry is whether the
prisoner was actually deprived of adequate medical care."  *Salahuddin v. Goord*, 467 F.3d 263,
279 (2d Cir. 2006).[12]  The second inquiry is "whether the inadequacy in medical care is
sufficiently serious.  This inquiry requires the court to examine how the offending conduct is

---

[12]  "As the Supreme Court has noted, the prison official's duty is only to provide
reasonable care."  *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 844–47
(1994)).

inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."
*Id.* at 280.  To meet this requirement, "the inmate must show that the conditions, either alone or
in combination, pose an unreasonable risk of serious damage to his health."  *Walker v. Schult*,
717 F.3d 119, 125 (2d Cir. 2013).  "There is no settled, precise metric to guide a court in its
estimation of the seriousness of a prisoner's medical condition."  *Brock v. Wright*, 315 F.3d 158,
162 (2d Cir. 2003).  Nevertheless, the Second Circuit has "presented the following non-
exhaustive list of factors to consider when evaluating an inmate's medical condition:  (1)
whether a reasonable doctor or patient would perceive the medical need in question as important
and worthy of comment or treatment, (2) whether the medical condition significantly affects
daily activities, and (3) the existence of chronic and substantial pain."  *Morales v. Fischer*, 46 F.
Supp. 3d 239, 247 (W.D.N.Y. 2014) (quoting *Brock*, 315 F.3d at 162) (internal quotation marks
omitted).

   "The second requirement is subjective: the charged officials must be subjectively reckless
in their denial of medical care."  *Spavone*, 719 F.3d at 138.  Under the second prong, the
question is whether defendants "knew of and disregarded an excessive risk to [a plaintiff's]
health or safety and that [they were] both aware of facts from which the inference could be
drawn that a substantial risk of serious harm existed, and also drew the inference."  *Caiozzo*, 581
F.3d at 72 (alterations and internal quotation marks omitted).  In other words, "[i]n medical-
treatment cases not arising from emergency situations, the official's state of mind need not reach
the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the
official acted with deliberate indifference to inmate health."  *Nielsen v. Rabin*, 746 F.3d 58, 63
(2d Cir. 2014) (internal quotation marks omitted).  "Deliberate indifference is a mental state
equivalent to subjective recklessness" and it "requires that the charged official act or fail to act

while actually aware of a substantial risk that serious inmate harm will result." *Id.* (internal quotation marks omitted).  In contrast, mere negligence is not enough to state a claim for deliberate indifference.  *See Walker*, 717 F.3d at 125; *Vail v. City of N.Y.*, 68 F. Supp. 3d 412, 424 (S.D.N.Y. 2014).  Moreover, "mere disagreement over the proper treatment does not create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998); *see also Banks v. Annucci*, 48 F. Supp. 3d 394, 407–08 (N.D.N.Y. 2014) (same).

Here, Plaintiff alleges that, after being "made to stand in the back of [a] shower bleeding and in agonizing pain for twenty minutes or more," he was then taken to be examined by medical staff nurse Nugent.  Nurse Nugent then examined Plaintiff and told him that he would be taken to an outside hospital, but Schrander, Freeman, and Luciano shackled Plaintiff and "placed him in a van where [he] sat at a Sing Sing check point bleeding in excruciating pain for several hours before finally being taken to Mount Vernon Emergency Room."  (*See* Am. Compl. ¶¶ 20–21.) Read liberally, Plaintiff alleges that these three Defendants took custody of Plaintiff—beaten and bloodied—from a medical professional who determined that Plaintiff needed outside medical care, and left him to languish in excruciating pain for hours.  This states an Eighth Amendment claim.  *See Espinosa v. McCabe*, No. 10-CV-497, 2012 WL 4108884, at *11 (N.D.N.Y. Aug. 28, 2012) (recommending the defendants' summary judgment motion be denied where the plaintiff asserted that, after being assaulted and losing consciousness, three defendants "abandoned him and failed to provide notification to the proper individuals that medical assistance was necessary" and two others moved the plaintiff, who was moaning in pain, to a cell where they left him), *adopted by* 2012 WL 4107908 (N.D.N.Y. Sept. 19, 2012); *Scott v. Abate*, No. 93-CV-

4589, 1995 WL 591306, at *1 (E.D.N.Y. Sept. 27, 1995) (finding that the plaintiff stated a claim against a defendant correction officer where the defendant failed to take the plaintiff to the clinic after an accident); *Hodge v. Coughlin*, No. 92-CV-622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994) (noting that "[t]o establish [a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel] [a] plaintiff must prove that prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment."), *aff'd*, 52 F.3d 310 (2d Cir. 1995).  More specifically, Plaintiff adequately satisfies the objective prong that "the alleged deprivation of adequate medical care . . . be sufficiently serious," *Spavone,* 719 F.3d at 138, because he suffered hours of "excruciating pain" allegedly after a beating, (*see* Am. Compl. ¶¶ 19–21), which is objectively serious, *see, e.g.*, *Reeder v. Artus*, No. 09-CV-575, 2010 WL 3636138, at *9 (N.D.N.Y. July 27, 2010) (concluding in excessive force context that the plaintiff satisfied the objective requirement where he alleged that he suffered "excruciating pain in his fingers, face and neck; a swollen face, knee and fingers; black eyes; and a bloody ear"), *adopted by*, 2010 WL 3636132 (N.D.N.Y. Sept. 9, 2010).  Likewise, the subjective prong is fulfilled because, by knowing—whether from seeing his injuries, hearing about the beating, speaking with Nugent, or anything else—about Plaintiff's need to go to an outside medical facility but yet leaving him to suffer in a van for hours, these Defendants were "aware of a substantial risk [of] serious inmate harm" and yet "fail[ed] to act." *Nielsen,* 746 F.3d at 63.  Therefore, Plaintiff has stated a claim against these Defendants under the Eighth Amendment.[13]

---

[13]  In his Opposition, Plaintiff prevails upon the Court to "take note of the [D]efendant[s'] failure to contest [P]laintiff['s] factual claims of conspiracy between [D]efendant[]s Schrader, Freeman, Luciano, who[] collaborated with each other and other unknown correction official[]s

### 3.  Failure to Exhaust

Defendants argue that Plaintiff has failed to fully administratively exhaust his claims against Schrader, Freeman, and Luciano as required by the Prison Litigation Reform Act ("PLRA").  (*See* Defs.' Mem. 12–14.)

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement applies to all personal incidents while in prison, *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also*

---

in delaying [P]laintiff's transfer to [the] outside hospital."  (Pl.'s Opp'n 12.)  Specifically, Plaintiff says that these three "conspired with [D]efendants B[e]llinger, Woody Jr., and Dowtin in delaying [P]laintiff's emergenc[y] medical needs by holding [P]laintiff shackled and handcuffed in a van . . . for several hours while he was bleeding and in obvious pain."  (*Id.* at 11 (citing Am. Compl. ¶¶ 8, 20, 21).)  Neither these allegations nor the Amended Complaint, however, adequately state a claim for conspiracy in this regard.  "To prove a § 1983 conspiracy, a plaintiff must show:  (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (same); *Randle v. Alexander*, 960 F. Supp. 2d 457, 475 (S.D.N.Y. 2013) (same); *Barnes v. Abdullah*, No. 11-CV-8168, 2013 WL 3816586, at *9 (S.D.N.Y. July 22, 2013) (same).  Even read liberally, however, the Amended Complaint and Plaintiff's Opposition—apart from its conclusory assertions of a conspiracy—simply do not include factual content by which the Court could surmise a conspiracy.  Indeed, perhaps to the contrary, the Amended Complaint—in one of the paragraphs Plaintiff cites to suggest there was a conspiracy—alleges that Schrander, Freeman, and Luciano "act[ed] *individually or in conjunction* with each other and other named defendants" to violate his rights.  (*See* Am. Compl. ¶ 8 (emphasis added).)  That ambivalence, rather than plausibly alleging, arguably *undercuts* the likelihood of a conspiracy.  The Amended Complaint does, of course, provide a basis to think that these three Defendants worked together to harm Plaintiff, thereby "act[ing] in concert to inflict an unconstitutional injury," *Pangburn*, 200 F.3d at 72.  But that cannot be enough to create a § 1983 conspiracy because, otherwise, a conspiracy could spontaneously exist whenever multiple actors were responsible for a single constitutional tort.

*Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures").  Moreover, the PLRA mandates "'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' . . . [which] entails . . . 'completing the administrative review process in accordance with the applicable procedural rules.'"  *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)).

The Second Circuit has made clear that "administrative exhaustion is not a jurisdictional predicate," but rather failure to exhaust "is an affirmative defense."  *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (citation omitted).  Accordingly, "defendants bear the burden of proof[,] and prisoner plaintiffs need not plead exhaustion with particularity."  *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003); *see also Miller v. Bailey*, No. 05-CV-5493, 2008 WL 1787692, at *3 (E.D.N.Y. Apr. 17, 2008) (explaining that the exhaustion requirement "must be pleaded and proved by a defendant" (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007))).  Further, "[a] court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available."  *Rossi v. Fischer*, No. 13-CV-3167, 2015 WL 769551, at *4 (S.D.N.Y. Feb. 24, 2015) (internal quotation marks omitted) (quoting *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004)).  The Second Circuit has likewise recently made clear that "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law," and "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute."  *Hubbs v. Suffolk Cty.*

40

*Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation, alteration, and internal quotation marks

omitted); *see also Perez v. City of N.Y.*, No. 14-CV-7502, 2015 WL 3652511, at *2 (S.D.N.Y.

June 11, 2015) (same).

Importantly, the Second Circuit has recognized certain exceptions to the exhaustion

requirement that apply when:  "(1) administrative remedies are not available to the prisoner; (2)

defendants have either waived the defense . . . or acted in such a[] way as to estop them from

raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the

grievance procedures, justify the prisoner's failure" to exhaust his remedies.  *Ruggiero v. Cty. of

Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d

Cir. 2004)).  "[T]he resolution of the exhaustion issue does not necessarily fit exactly into any of

these three categories, and a particular fact pattern may implicate one or a combination of these

factors."  *Pagan v. Brown*, No. 08-CV-724, 2009 WL 2581572, at *5 (N.D.N.Y. Aug. 19, 2009)

(citing *Giano*, 380 F.3d at 677 n.6).  Therefore, a motion to dismiss pursuant to Rule 12(b)(6) for

failure to exhaust should be granted only if "nonexhaustion is clear from the face of the

complaint, and none of the exceptions outlined by the Second Circuit [is] germane."  *Lovick*,

2014 WL 3778184, at *4 (alterations and internal quotation marks omitted); *see also Lee v.

O'Harer*, No. 13-CV-1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal

under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face

of the complaint and incorporated documents."); *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL

3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative

defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to

resolution by way of a motion to dismiss."  (internal quotation marks omitted)).

Despite the foregoing, it is not entirely clear that these exceptions—colloquially referred to as the *Hemphill* exceptions—remain good law after the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006).  In *Woodford*, the Supreme Court held that the PLRA's exhaustion requirement mandates not merely "exhaustion *simpliciter*" but rather "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules."  *See Woodford*, 548 U.S. at 83, 88, 91.  Although Second Circuit law confirms that *Woodford* may indeed have imperiled the *Hemphill* exceptions' vitality, it has not yet explicitly determined whether these three exceptions remain good law.  *See, e.g.*, *Amador*, 655 F.3d at 102 ("Subsequent decisions have questioned the continued viability of this framework following the Supreme Court's decision in *Woodford* . . . ."); *Ruggiero*, 467 F.3d at 176 ("We need not determine what effect *Woodford* has on our case law in this area, however, because [the plaintiff] could not have prevailed even under our pre-*Woodford* case law."); *Rambert v. Mulkins*, No. 11-CV-7421, 2014 WL 2440747, at *11 (S.D.N.Y. May 30, 2014) (noting that "the Second Circuit has left unresolved the continuing vitality of the *Hemphill* exceptions in light of the Supreme Court's ruling in *Woodford v. Ngo*," but concluding that "*Hemphill* remains good law").

Nevertheless, when nonexhaustion is not clear from the face of the complaint, a defendant's motion may be converted to a motion for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about [the] plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused."  *Stevens v. City of N.Y.*, No. 12-CV-1918, 2012 WL 4948051, at *3 (S.D.N.Y. Oct. 11, 2012) (quoting *McCoy*, 255 F. Supp. 2d at 251); *see also Rambert*, 2014 WL 2440747, at *6 (same); *Smalls v. Jummonte*, No. 08-CV-4367, 2010 WL 3291587, at *3

(S.D.N.Y. Aug. 13, 2010) (same).  When doing so in the context of an action brought by a pro se prisoner, the potential consequences of a motion for summary judgment as well as the procedural requirements for responding to one must first be explained, and the Court should also allow Plaintiff the opportunity to take discovery.  *See Hernández v. Coffey*, 582 F.3d 303, 305, 307–08 (2d Cir. 2009) (noting that "[i]n the case of a pro se party . . . , notice is particularly important because the pro se litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues," and that, "[a]ccordingly, pro se parties must have unequivocal notice of the meaning and consequences of conversion to summary judgment" (alterations, internal quotation marks, and italics omitted)).  As a result, in the PLRA exhaustion context, courts have insisted upon limited discovery before converting a motion to dismiss for failure to exhaust administrative remedies as required by the PLRA into a summary judgment motion.  *See, e.g.*, *Lovick*, 2014 WL 3778184, at *5 (observing that "when converting a Motion to Dismiss into a Motion for Summary Judgment under Fed. R. Civ. P. 12(d), notice to the parties is mandated, particularly when a pro se litigant is involved," and accordingly "permit[ting] the parties to engage in limited discovery confined solely to the issue of administrative exhaustion"); *Pratt v. City of N.Y.*, 929 F. Supp. 2d 314, 319 (S.D.N.Y. 2013) (noting that the court could convert the motion to dismiss into a motion for summary judgment on the issue of PLRA exhaustion, but observing that, if it were to do so, "the parties would be entitled to an opportunity to take discovery and submit additional relevant evidence, and the parties have not yet been allowed such an opportunity"); *Stevens*, 2012 WL 4948051, at *6–7 (converting a motion to dismiss into a motion for summary judgment, but allowing for a period of discovery limited to the issue of administrative exhaustion); *cf. Rodriguez v. Warden, Metro. Corr. Facility*, No. 13-CV-3643, 2015 WL 857817, at *10 (S.D.N.Y. Feb. 27, 2015) (noting that, "if the [c]ourt were to convert

43

the motion [for judgment on the pleadings into one for summary judgment], all parties must be afforded the opportunity to present supporting material," and observing that "the [c]ourt may permit limited discovery exclusively on the issue of exhaustion" (alterations and internal quotation marks omitted)).

A number of courts have, however, declined to convert the motion where discovery may reveal whether administrative remedies were available to a plaintiff or other special circumstances would excuse his failure to exhaust.  *See McNair v. Rivera*, No. 12-CV-6212, 2013 WL 4779033, at *6 (S.D.N.Y. Sept. 6, 2013) (declining to convert motion because "bifurcating discovery, with additional motion practice, creates the potential for complication and delay," and because the court "[did] not anticipate that full fact discovery [would] be sufficiently laborious . . . to counter [the] plaintiff's interest in a timely disposition of his suit"); *Rosenberg v. Coon*, No. 12-CV-3803, 2013 WL 1223516, at *2 n.1 (S.D.N.Y. Mar. 27, 2013) ("[The] [d]efendants submit the declaration of the Director of the Inmate Grievance Program . . . , which cannot properly be considered on a motion to dismiss.  Because the [c]ourt declines to convert [the] defendants' motion to a motion for summary judgment, it does not consider the declaration."); *Shapiro v. Cmty. First Servs., Inc.*, No. 11-CV-4061, 2013 WL 1122628, at *6 (E.D.N.Y. Mar. 18, 2013) (declining to convert a motion to dismiss into a motion for summary judgment because discovery had not yet occurred and because Fed. R. Civ. P. 12(d) contained no authority to convert a Rule 12(b)(1) motion into a motion for summary judgment); *Pratt*, 929 F. Supp. 2d at 319 (declining to convert motion to dismiss into a motion for summary judgment on the issue of exhaustion of administrative remedies and denying motion to dismiss on such grounds, noting that "[w]hether administrative remedies were in fact available to the

plaintiff and whether they were otherwise ineffective are questions of fact that cannot be resolved on this motion to dismiss").

Here, Plaintiff's non-exhaustion is not clear from the face of the Amended Complaint, which indicates that he did file a grievance, albeit about "[t]he assault by correctional officer[]s C. Dowtin, R. Woody Jr., [and] T. Bellinger." (*See* Am. Compl. 4.)[14]  Moreover, Plaintiff argues that his "failed attempt to file a second grievance can be attributed to the Sgt. and officer[]s assigned in SHU at Sing Sing Correctional Facility, who refused to provide [P]laintiff with . . . grievance forms." (Pl.'s Opp'n 13–14.)  It would thus be premature to dismiss Plaintiff's claims for failure to exhaust his administrative remedies.  The Court would, however, be within its rights to convert the Motion to Dismiss into a summary judgment motion; however, the Court declines to do so.  *See Pratt*, 929 F. Supp. 2d at 319 (noting that the court could convert motion to dismiss into summary judgment motion on PLRA issue but declining to do so).  Here, the Court does not think there is sufficient reason to bifurcate discovery and delay the ultimate resolution of this case in order to facilitate resolution of the PLRA issue before other issues that may come up on a summary judgment motion.  *See McNair*, No. 2013 WL 4779033, at *6.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion in part, and the claims against Fischer, Heath, and Barnes are hereby dismissed.  Additionally, Plaintiff's claims against

---

[14]  To be sure, one could cry expressio unius est exclusio alterius and argue that this means the Amended Complaint betrays Plaintiff's non-exhaustion with respect to his claims against Schrader, Freeman, and Luciano.  However, liberally construing Plaintiff's Amended Complaint, it could also be taken to mean that Plaintiff thought he had exhausted his remedies with all his claims growing out of "[t]he assault by [the] correctional officer[]s." (*See* Am. Compl. 4.)

Keyser are dismissed, except for the claim relating to his review of Plaintiff's disciplinary proceedings. These dismissals are without prejudice, meaning that Plaintiff will be given an opportunity to amend his complaint, but he must do so within 30 days. Defendants' Motion is in all other respects denied.

The Clerk of the Court is respectfully requested to terminate the pending Motion. (*See* Dkt. No. 59.)

SO ORDERED.

Dated:      March  , 2016
               White Plains, New York

                                                  KENNETH M. KARAS
                                                  UNITED STATES DISTRICT JUDGE

46