UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KENNETH SAMUELS,

               Plaintiff,

     -v-

ALBERT PRACK, Director of Special Housing; C.
GAMBLE, Correction Sergeant; CORRECTION
CAPTAIN R. BRERETON; CORRECTION
SERGEANT K. WHITE; CORRECTION OFFICER
L. GOULD; T. BELLINGER, Correction Officer; R.
WOODY, JR., Correction Officer; CORRECTION
OFFICER C. DOWTIN; CORRECTIONAL
OFFICER J. FREEMAN; CORRECTIONAL SGT.
SHRADER; CORRECTIONAL OFFICER S.
LUCIANO; BRIAN FISCHER, Commissioner of
DOCS; PHILIP D. HEATH, Superintendent; M.
BARNES, Correction Sergeant; D. KEYSOR, Deputy
Superintendent,

               Defendants.

Case No. 13-CV-8287 (KMK)

OPINION & ORDER

---

Appearances:

Kenneth Samuels
Malone, NY
*Pro Se Plaintiff*

Mary Kim, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

     Plaintiff Kenneth Samuels ("Plaintiff") brings this action against Defendants Albert

Prack, C. Gamble, Correction Captain R. Brereton, Correction Sergeant K. White, Correction

Officer L. Gould, T. Bellinger, R. Woody, Jr., Correction Officer C. Dowtin, Correctional

Officer J. Freeman, Correctional Sgt. Schrader, Correctional Officer S. Luciano, Brian Fischer, Philip D. Heath, M. Barnes, and D. Keysor alleging violations of his constitutional and statutory rights pursuant to 42 U.S.C. § 1983.  Defendants Fischer, Heath, Keyser,[1] and Barnes (collectively, "Moving Defendants") have moved to dismiss Plaintiff's Second Amended Complaint against them for failure to state a claim.  For the reasons to follow, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Second Amended Complaint and are accepted as true for purposes of this Motion.  At the time of the events described herein, Plaintiff was an inmate at Sing Sing Correctional Facility ("Sing Sing").  (Second Am. Compl. 2 (Dkt. No. 90).)

With one exception, noted below, the facts alleged in the Second Amended Complaint relating to the incident on November 16, 2010, which gave rise to the claims in this case, and the proceedings arising from that incident are identical to those facts alleged in the First Amended Complaint.

#### 1.  The Alleged Assault

On November 16, 2010, Plaintiff entered the B-block housing unit, from which he took his shower gear, and went to the Q-Gallery to wait in line for the "bathhouse run."  (*Id.* ¶ 43.) After waiting in line for at least 20 minutes, Plaintiff asked Defendant Woody what the hold-up was.  (*Id.* ¶ 44.)  Woody told him that A-Block was running prisoners to the auditorium for movies.  (*Id.*)  Plaintiff then asked Woody if he could return to his cell, skipping the bathhouse,

---

[1] Keyser's name is misspelled as "Keysor" in the caption to Plaintiff's Second Amended Complaint.

and go to the yard when the bathhouse returned.  (*Id.*)  Woody said no, telling Plaintiff that because he put down for the bathhouse, he had to go to it.  (*Id.*)

Ten minutes later, an announcement was made instructing all prisoners waiting for the bathhouse run to return all cigarettes to their cells.  (*See id.*)  Plaintiff and several other prisoners went to the back of the Q-Gallery, where Plaintiff showed Defendant Bellinger his cigarettes.  (*Id.* ¶ 45.)  Bellinger waved Plaintiff and other inmates through.  (*Id.*)  Plaintiff then returned the cigarettes to his cell on W-Gallery.  (*Id.*)  Upon returning, Plaintiff heard Dawtin call down to Bellinger, instructing him to stop the inmate coming off of R-Gallery, apparently in reference to Plaintiff.  (*See id.*)[2]  Bellinger told Dawtin that Plaintiff had just returned cigarettes to his cell on W-Gallery, but Dawtin replied that he did not call W-Gallery, telling Bellinger to send Plaintiff back.  (*Id.*)  Plaintiff attempted to explain to Dawtin that he had been in the Q-Gallery waiting for the bathhouse run prior to the announcement.  (*Id.*)  Dawtin cut Plaintiff off, saying that he did not call W-Gallery, instructing Plaintiff to "take it back and lock it in."  (*Id.*)

Plaintiff then proceeded back down the gallery to his cell while speaking to Bellinger, during which time Woody sarcastically told Plaintiff that he should not have put down for the bathhouse anyway.  (*Id.* ¶ 46.)  Plaintiff responded, saying, "no one[']s talking to you[;] mind your fucking business."  (*Id.*)  While Plaintiff was waiting for Gould to open his cell, Plaintiff saw Woody, Dawtin, and Bellinger approaching.  (*Id.* ¶ 47.)  Plaintiff put his hands on the fenced gate, but Woody said that it was "to[o] late for that" and began pushing Plaintiff back in the direction from which he had come.  (*Id.*)  Gould stood in the middle of the W-Gallery while Plaintiff was being pushed and shoved down the gallery.  (*Id.*)  At that time, Woody, Dawtin, and

---

[2] Dawtin's name is misspelled as "Dowtin" in the caption to Plaintiff's Second Amended Complaint.

Bellinger began punching Plaintiff and striking him on the back of the head.  (*Id.*)  Plaintiff turned around and said that all of this was unnecessary.  (*Id.*)  Woody, Dawtin, and Bellinger continued throwing punches, striking Plaintiff around the face.  (*Id.*)  Plaintiff then tried to flee, but Woody grabbed him by the collar of his shirt as Bellinger and Dawtin drew their batons. (*See id.*)  Plaintiff, fearing for his life, attempted to break Woody's hold on his collar, but could not.  (*Id.*)  Plaintiff, fearing further assault, attempted to defend himself, successfully blocking with his arm a blow toward his head from Bellinger's baton.  (*Id.*)  Dawtin then rammed his baton into Plaintiff's forehead, causing Plaintiff's head to snap back and his shirt to rip.  (*See id.*) As Plaintiff stumbled back, Woody struck Plaintiff on the head with his baton, causing Plaintiff to fall to the ground.  (*Id.*)  As Plaintiff tried to get up, he was repeatedly struck on the head and arms.  (*Id.*)

The attack continued until Barnes, who repeatedly ordered Woody, Dawtin, and Bellinger to stop, said, "that's enough[;] that's enough."  (*See id.* ¶ 48.)  During that time, Gould watched, doing nothing to stop the assault.  (*Id.*)  Plaintiff was then handcuffed, shoved down a flight of stairs, and pushed up against a wall.  (*Id.*)  Gamble shouted, "[W]hy is he still standing[?]  [W]hy is he still breathing?"  (*Id.*)  Plaintiff was then made to stand in the back of the shower, bleeding and in agonizing pain for 20 minutes before being taken to medical staff.  (*Id.*)

Here, Plaintiff adds an allegation not found in his First Amended Complaint:

> Prior to the assault, [D]efendant Barnes was sitting in a chair on Q-Gallery and observed Plaintiff cross from R-Gallery to W-Gallery.  Barnes upon witnessing [D]efendants Woody, Dowtin and Bellinger, [s]pecifically Woody and Dowtin[,] knew or should have known based on his knowledge of prior incidents involving Dowtin and/or Woody, that Plaintiff would likely be assaulted.  Barnes could have intervene[d] to stop the assault before it happened.  Barnes['] failure to exercise reasonable judgment based on the history of [D]efendants Woody and Dowtin shows a reckless disregard and/or deliberate indifference for the basic civil right[s] of Plaintiff.

(*Id.* ¶ 49.)

Plaintiff was then examined by C. Nugent, a medical staff nurse, who told Plaintiff that he would be taken to an outside hospital.  (*Id.* ¶ 50.)  Schrader, Freeman, and Luciano then shackled Plaintiff and placed him in a van, where Plaintiff sat at a Sing Sing check point for several hours, during which time Plaintiff was bleeding and in excruciating pain before being taken to the Mount Vernon Emergency Room.  (*Id.*)  Once there, Plaintiff was treated and received seven sutures to close the wounds to his head.  (*Id.*)  As a result of the alleged assault, Plaintiff alleges that he suffered contusions as well as bleeding lacerations and abrasions on his head with swelling and abrasions to his arms and neck.  (*Id.* at Dkt. No. 90-2, unnumbered 2.)  As a result of the injuries to his head, Plaintiff was still receiving pain medication at the time of the Second Amended Complaint.  (*Id.*)

### 2.  Proceedings Brought By and Against Plaintiff

On November 17, 2010, in what Plaintiff alleges was an "effort to shield the unwarranted, unprovoked assault," Plaintiff was issued two "Misbehavior Reports" dated November 16, 2010, claiming that he violated various rules of inmate behavior and charging him with two counts of violent conduct (Rule 104.11), two counts of creating a disturbance (Rule 104.13), two counts of assault on staff (Rule 100.11), "[i]nterference with [e]mployee," two counts of refusing direct orders (Rule 106.10), "[o]ut of [p]lace" (Rule 109.10), and a movement regulation violation (Rule 109.12).  (*Id.* ¶ 51.)  Lieutenant Pickens reviewed the misbehavior reports "allegedly written by [D]efendants Woody[] [and] Bellinger," and ordered Plaintiff confined to the special housing unit ("SHU").  (*Id.* ¶ 52.)

Heath designated Brereton to serve as the hearing officer for Plaintiff's disciplinary hearing, (*id.*), and, on November 21, 2010, Brereton commenced the "Tier III" hearing, in which

Plaintiff entered a plea of not guilty to each of the charges.  (*Id.* ¶ 53.)  Plaintiff asked for help

obtaining documents and locating and interviewing witnesses; accordingly, Brereton assigned

White to assist Plaintiff.  (*Id.*)  On November 23, 2010, Brereton concluded the hearing and

found Plaintiff guilty of violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), two

counts of assault on staff (Rule 100.11), two counts of refusing a direct order (Rule 106.10), a

movement regulation violation (Rule 109.12), and interference with employee (Rule 107.10).

(*Id.*)  Brereton imposed as penalties 30 months' confinement in the SHU, 30 months' loss of

packages, commissary, and phones, and 12 months' recommended loss of "[g]ood time."  (*Id.*)

Shortly thereafter, Plaintiff sought discretionary review from Heath.  (*Id.* ¶ 54.)  "[S]uch

review was passed along and subsequently denied."  (*Id.*)  On January 20, 2011, Plaintiff filed an

administrative appeal, which Fischer designated Prack to review.  (*Id.*)  By notice dated February

14, 2011, Prack, "acting on behalf of Fischer," notified Plaintiff that the November 23, 2010

decision had been affirmed.  (*Id.*)

On June 9, 2011, Plaintiff commenced an Article 78 proceeding challenging the denial of

his administrative appeal.  (*Id.* ¶ 55.)  Later, on November 9, 2011, those proceedings were

transferred to the Third Department of the New York Supreme Court's Appellate Division, and

Plaintiff filed his brief on January 12, 2012, which raised the same grounds as his Article 78

proceeding.  (*See id.* ¶¶ 55–56.)  By the time that the relief that Plaintiff sought was granted (on

August 2, 2012), he had served 22 months of his 30-month penalty, and Plaintiff remained in

"segregative confinement" until August 28, 2012.  (*Id.* ¶ 56.)

According to Plaintiff, Brereton and White "deliberately[,] intentionally[,] and knowingly

deprived [P]laintiff" of his constitutional due process rights in the context of a disciplinary

proceeding by "failing to conduct a fair hearing by a neutral arbitrator," by "denying Plaintiff the

6

right to call witnesses in support of his defense," and also by "adequate [sic] assistance[,] as well as [an] erroneously written Misbehavior Report."  (*Id.* ¶ 57.)  Likewise, Plaintiff alleges that Heath, Keyser, Fischer, and Prack, "upon learning of the violations[,] did allow[,] permit, approve, assist, sanction[][,] conspire[][,] or act[] in concert with [D]efendant Brereton."  (*Id.* ¶ 58.)

### 3.  Allegations Concerning Particular Prison Officials' Knowledge

The primary differences between Plaintiffs' First and Second Amended Complaints are the allegations related to the knowledge and personal involvement of Fischer, Heath, and Keyser. Whereas in the First Amended Complaint, Plaintiff alleged only that Fischer, Heath, and Keyser "failed to ensure that their subordinates were properly and adequately trained and periodically [updated] on the proper usage of force," (First Am. Compl. ¶ 13 (Dkt. No. 25)), and that their failure to "properly screen area supervisors and officers in conducting stress test[s] created and condone[d] the unlawful[,] unconstitutional, [and] customary practices of excessive use of force," (*id.*), in the Second Amended Complaint, Plaintiff has offered more numerous and more detailed allegations regarding the purported knowledge of Fischer, Heath, and Keyser. Specifically, Plaintiff has alleged that Fischer, Heath, and Keyser "knew or should have known the need for additional screening, training, supervision and discipline of subordinates prone to violence, known to engage in acts of abuse," (Second Am. Compl. ¶ 16), that they were "grossly negligent in supervising subordinates who brutally, maliciously assaulted Plaintiff without provocation" because they had "knowledge of the high volume of excessive use of force incidents occurring at Sing [] Sing and failed to correct or remedy the wrongful unconstitutional acts committed by subordinates," (*id.* ¶ 17), and that they evinced "intentional, deliberate indifference or a reckless disregard of basic civil rights" by failing to "adequately investigate,

screen, train, supervise and discipline subordinates," (*id.* ¶ 18).  As evidence of Fischer's,

Heath's, and Keyser's knowledge of wrongdoing, Plaintiff points to "repeated judicial finding[s]

that [Department of Corrections and Community Supervision] officers and supervising officials

engage in misconduct," (*id.* ¶ 19), "computer records concerning Unusual Incident Reports," (*id.*

¶ 22), and "various incidents involving unnecessary and excessive force, physical and verbal

abuse by subordinates on a monthly basis through meetings with [the] Inmate Liaison Committee

(ILC)," (*id.* ¶ 24).  Plaintiff further alleges that Fischer, Heath, and Keyser "should have done all

in their power to require an even more heightened and controlled level of supervision," (*id.* ¶ 29),

and that they espoused a "de facto policy or custom of tolerance of abuse, [and] unnecessary and

excessive use of force," (*id.* ¶ 32).  Attached to the Second Amended Complaint and referenced

in the statement of facts are various articles detailing cases of alleged violence by correction

officers against inmates in New York and the failings of the disciplinary system used to curb

such violence.  (*See id.* ¶ 36; *see id.* at Dkt. Nos. 90-3, 90-4, 90-5.)  Plaintiff also references what

he calls "the leading text on the subject" of prisoner mistreatment—a book called *Newjack:*

*Guarding Sing-Sing*, by Ted Conover.  (*Id.* ¶ 36.)

    B.  Procedural History

       Plaintiff filed his first Complaint on November 19, 2013.  (*See* Dkt. No. 2.)  Following an

order by the Court pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), directing

Defendants to provide the identity of several John Doe Defendants named by Plaintiff in his

Complaint, (*see* Dkt. No. 5), Plaintiff filed an Amended Complaint, (*see* Dkt. No. 25).

Defendants Fischer, Prack, Heath, Keyser, Barnes, White, Gould, Gamble, Schrader, Freeman,

and Luciano thereafter moved to dismiss the Amended Complaint for failure to state a claim.

(*See* Dkt. No. 59.)  Plaintiff opposed the Motion.  (*See* Dkt. No. 72.)  The remaining Defendants filed their Answer.  (*See* Dkt. No. 66.)

On March 2, 2016, the Court decided Defendants' Motion To Dismiss.  (*See* Dkt. No. 85.)  The Court dismissed all of Plaintiff's claims against Fischer and Heath, holding that Plaintiff had not adequately alleged their personal involvement in a constitutional violation.  (*See id.* at 22.)  The Court also dismissed Plaintiff's claim against Keyser for lack of personal involvement, except for the claim relating to Keyser's review of Plaintiff's disciplinary proceedings.  (*See id.* at 46.)  And the Court dismissed Plaintiff's claim against Barnes on the ground that Plaintiff had not adequately alleged that Barnes "had reason to know that excessive force was being used and had a realistic opportunity to intervene to prevent the harm from occurring."  (*Id.* at 33–34.)  The Court denied the Motion in all other respects, and all dismissals were without prejudice.  (*See id.* at 46.)

On May 12, 2016, Plaintiff filed his Second Amended Complaint.  (*See* Dkt. No. 90.)  As set forth above, the Second Amended Complaint is identical to the First Amended Complaint with two exceptions: (1) the additional allegations relating to Fischer's, Heath's, and Keyser's purported knowledge and personal involvement, and (2) the additional allegation relating to Barnes's whereabouts and knowledge at the time of the assault.  On August 18, 2016, Moving Defendants filed their Motion To Dismiss, (*see* Dkt. No. 95), arguing again that Plaintiff had failed to allege the personal involvement of Fischer, Heath, and Keyser, and that Plaintiff had not stated an Eighth Amendment claim against Barnes, (*see* Defs. Fischer, Heath, Keyser, & Barnes' Mem. of Law in Supp. of Their Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 96)).  Plaintiff filed an opposition on October 21, 2016, (*see* Dkt. No. 101), and followed up with additional

documents on October 26, 2016, (*see* Dkt. No. 102).  Moving Defendants filed their Reply in

support of their Motion on November 18, 2016.  (*See* Dkt. No. 105.)

II.  Discussion

A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks

omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from

conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679

("Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense.  But where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader

is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P.

10

8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

B.  Analysis

Moving Defendants raise two broad arguments: (1) Plaintiff has failed to allege the personal involvement of Fischer, Heath, and Keyser in any constitutional violations, and (2) Plaintiff has failed to state an Eighth Amendment claim against Barnes.  The Court will address each in turn.

1.  Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)).  Relatedly, "[i]n an action under 42 U.S.C. § 1983, defendants cannot be held liable under a theory of respondeat superior," *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5547277, at *7 (S.D.N.Y. Sept. 18, 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); in other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the [law]," *Iqbal*, 556 U.S. at 676; *see also Fortunato v. Bernstein*, No. 12-CV-1630, 2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) ("Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." (internal quotation marks omitted)).

The Second Circuit has set forth five ways in which a plaintiff may plead the personal involvement of a defendant:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

> to remedy the wrong, (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance of such a policy or
> custom, (4) the defendant was grossly negligent in supervising subordinates who
> committed the wrongful acts, or (5) the defendant exhibited deliberate indifference
> to the rights of inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

*Grullon*, 720 F.3d at 139 (italics omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

1995)).  As discussed in the Court's prior Opinion, (*see* Op. & Order 12–13), however, the

Second Circuit has recognized that the "[*Iqbal*] decision . . . may have heightened the

requirements for showing a supervisor's personal involvement with respect to certain

constitutional violations," *Grullon*, 720 F.3d at 139, but has "thus far declined to resolve the

question," *Golodner v. City of New London*, No. 14-CV-173, 2015 WL 1471770, at *7 (D. Conn.

Mar. 31, 2015); *see also Fortunato*, 2015 WL 5813376, at *6 (noting that "the continuing

validity of the *Colon* factors has been called into question by the Supreme Court's ruling in

*Iqbal*").  Thus, courts in the Second Circuit are divided as to whether the five categories

announced in *Colon* may still be used as bases for liability under § 1983.  *Compare, e.g.*, *Hollins*

*v. City of New York*, No. 10-CV-1650, 2014 WL 836950, at *13 (S.D.N.Y. Mar. 3, 2014)

(holding that only the first and part of the third categories in *Colon* survive *Iqbal*), *and Bellamy*

*v. Mount Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009)

(same), *aff'd*, 387 F. App'x 55 (2d Cir. 2010), *with Marom v. City of New York*, No. 15-CV-

2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) ("The holding in *Iqbal* does not stand

for the proposition that a supervisor can never be found personally liable for a constitutional

deprivation on a showing that he was 'grossly negligent' or 'deliberately indifferent.'"), *partial*

*reconsideration granted*, 2016 WL 5900217 (S.D.N.Y. July 29, 2016), *and Sash v. United States*,

674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a

showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate

13

indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply."), *and Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) (holding that if "the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply, insofar as it is consistent with the particular constitutional provision alleged to have been violated" (internal quotation marks omitted)).   Some courts have simply concluded that, in the absence of Second Circuit precedent suggesting otherwise, they will continue to apply the *Colon* test.  *See, e.g.*, *Doe v. New York*, 97 F. Supp. 3d 5, 12 (E.D.N.Y. 2015); *Johnson v. Fischer*, No. 12-CV-210, 2015 WL 670429, at *7 n.6 (N.D.N.Y. Feb. 17, 2015).  On balance, "[t]he majority of the district courts . . . have held that, absent any contrary directive from the Second Circuit, all five *Colon* factors survive where the constitutional violation at issue does not require a showing of discriminatory intent."  *El-Hanafi v. United States*, No. 13-CV-2072, 2015 WL 72804, at *13 (S.D.N.Y. Jan. 6, 2015) (alteration and internal quotation marks omitted).

This Court has already expressed its agreement with those cases holding that all five categories under *Colon* are still valid unless and until the Second Circuit holds otherwise.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4–5 (S.D.N.Y. Jan. 24, 2017).  The Court thus adheres to its prior ruling that "*Colon* still controls with respect to claims that do not require a showing of discriminatory intent," *id.* at *4, as there is no reason "to read into *Iqbal* a repudiation of the unremarkable holding in *Colon* that personal involvement may be proven in ways other than direct participation," *id.* at *5.  Accordingly, as Plaintiff has not raised a claim of unconstitutional discrimination, the Court will examine the sufficiency of Plaintiff's pleadings under the five categories in *Colon*.

With respect to the specific allegations raised here, as an initial matter, "a complaint that essentially regurgitates the relevant 'personal involvement' standard, without offering any facts indicting that, or how, an individual defendant in a supervisory role was personally involved in a constitutional violation, cannot withstand dismissal." *Davis v. County of Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005).  "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (alteration and internal quotation marks omitted).  The bulk of Plaintiff's new allegations merely recite the elements of personal involvement in a conclusory fashion. (*See* Second Am. Compl. ¶¶ 18–42.)  To the extent Plaintiff relies on these allegations to establish the personal involvement of Fischer, Heath, and Keyser, those allegations are insufficient.

Plaintiff also adduces evidence, however, showing that there are numerous incidents and accusations of brutality by correction officers at Sing Sing and at other facilities.  (*See id.* ¶¶ 22–26.)  Plaintiff alleges that based on the fact that Fischer, Heath, and Keyser were aware, through Unusual Incident Reports, (*see id.* ¶ 22), monthly Inmate Liaison Committee meetings, (*see id.* ¶ 24), and investigative reports conducted by the Times Union, New York Times, and the Marshall Project, (*see id.* ¶ 36), that there is pervasive officer misconduct in the New York correction system, the Court may infer a "de facto policy or custom of tolerance of abuse, unnecessary and excessive use of force," (*id.* ¶ 32; *see also* ¶¶ 25–26, 31, 33–34).

Having reviewed the allegations in the Second Amended Complaint and the articles attached thereto, the Court is satisfied that Plaintiff has adequately pleaded the personal involvement of Fischer.  Plaintiff includes news articles—unproven at this stage, but presumed true for the purposes of the Motion—that include claims that there is a "widespread epidemic of

inmate mistreatment" in New York prisons, (Second Am. Compl. Dkt. No. 90-3, unnumbered 2),

the unit assigned to investigate inmates' claims of officer brutality has been "an embarrassment

for years," (*id.* at 90-3, unnumbered 5), and a "culture of brutality has been allowed to thrive in

the prisons," (*id.*).  Those claims are supported by specific factual allegations, including:

- Two instances of inmates allegedly being attacked by correction officers, one in

  November 2013 at Downstate Correctional Facility, (*see id.* at unnumbered 3), and one in

  April 2015 at Fishkill Correctional Facility, (*see id.* at unnumbered 2);

- A third incident which took place at Sing Sing in May 2015, and after which the now-

  Superintendent at Sing Sing admitted that "brutality by guards was a persistent problem,"

  (*id.* at unnumbered 7);

- Numerous settlements paid by New York in connection with lawsuits filed by inmates

  alleging they were unjustifiably beaten by correction officers, including a $60,000

  settlement and a $52,500 settlement for cases involving correction officers against whom

  federal charges were later brought, (*id.* at unnumbered 4); and

- That in 2015, approximately 10% of the investigation unit's investigators were removed

  because they were unqualified, (*see id.*).

Most striking are the references to two pending (at the time) federal criminal investigations into

beatings by correction officers, (*see id.* at unnumbered 2), and the acknowledgment by high-

ranking officials at the New York State Department of Corrections and Community Supervision

that drastic improvement in the oversight of correction officer behavior is needed, (*see id.* at

unnumbered 5).  The articles include references to the leverage the correction officers' union

allegedly holds over the disciplinary process, noting that the disciplinary system is "so stacked in

the union's favor that a guard could be found guilty of brutalizing an inmate and not be fired,"

(*id.*), and pointing out that even if a correction officer is convicted of a misdemeanor, he or she

may not be terminated, (*id.*).  There are, according to one article cited by Plaintiff, approximately

1,000 open case files regarding alleged wrongdoing by correction officers, including:

> an officer at Southport Correctional Facility, Peter A. Mastrantonio, who has been
> sued 17 times in brutality cases that have cost the state $673,000 in settlements; an
> 81-year-old inmate at Sullivan Correctional Facility, James Willsey, who is partly
> deaf and losing his sight, and was knocked unconscious while handcuffed; and a
> Great Meadow inmate, Frank Povoski, who was beaten after being quoted in The
> [New York] Times about an inmate's death at the hands of guards.

(*Id.*)

In *White v. City of New York*, No. 13-CV-7421, 2015 WL 4601121 (S.D.N.Y. July 31,

2015), the court partially denied one of the defendants' motion to dismiss a claim asserting an

unconstitutional policy or practice at Rikers Island based on the plaintiff's invocation of a

Department of Justice ("DOJ") Findings Letter, which determined that there existed at Rikers

Island a "deep-seated culture of violence . . . pervasive throughout the adolescent facilities at

Rikers," and concluded that "DOC staff routinely utilize[d] force not as a last resort, but instead

as a means to control the adolescent population and punish disorderly or disrespectful behavior."

*Id.* at *3, *6.  Although the plaintiff was not an adolescent, the court concluded that the

plaintiff's claim alleging an unconstitutional policy or practice could go forward because of the

"parallels in the underlying conduct that [was] alleged to have occurred during the exact same

time period at Rikers Island."  *Id.* at *7.

Here, it is only the motion to dismiss phase, and the Court need not be convinced that

Plaintiff's allegations are true or credible.  As in *White*, the type of conduct detailed in the

various media reports cited by Plaintiff parallels the conduct of which he accuses Defendants.

And while the court in *White* was faced with a Findings Letter issued by the DOJ, the Court, at

this stage, is not entitled to draw distinctions between the credibility of the DOJ and the

credibility of Plaintiff or the news outlets on which he relies.  Accordingly, taking Plaintiff's
allegations as true, the Court is persuaded that there is a plausible claim that Fischer was
personally involved in the violation of Plaintiff's constitutional rights by, namely, creating a
"policy or custom under which unconstitutional practices occurred," "allow[ing] the continuance
of such a policy or custom," being "grossly negligent in supervising subordinates who committed
the wrongful acts," or "failing to act on information indicating that unconstitutional acts were
occurring."  *Grullon*, 720 F.3d at 139 (italics and internal quotation marks omitted); *see also*
*Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, at *11 (S.D.N.Y. Sept. 27, 2012)
(denying, in part, a motion to dismiss, where the complaint "allege[d] facts demonstrating
widespread use of excessive force in the [Westchester County Jail]," and holding the warden
could be liable where he "knew or but for [his] deliberate indifference should have known of [the
officers'] custom and practice of use of excessive force, but failed to correct same through
training, supervision or discipline due to their grossly negligent, reckless or intentional conduct"
(internal quotation marks omitted)); *cf. McCants v. City of Newburgh*, No. 14-CV-556, 2014 WL
6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (denying, in part, a motion to dismiss a claim against a
municipality, reasoning that prior instances of misconduct were "evidence the [c]ity was on
notice to the possible use of excessive force by its police officers on seventeen different
occasions"), *clarified on denial of reconsideration*, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014).

This holding is strengthened, and is extended to both Heath and Keyser, by Plaintiff's
allegations that Fischer, Heath, and Keyser were "made aware of various incidents involving
unnecessary and excessive force, physical and verbal abuse by subordinates on a monthly basis
through meetings with [the] Inmate Liaison Committee."  (Second Am. Compl. ¶ 24.)  While
"[e]vidence of notification . . . of an unconstitutional condition alone is not sufficient to indicate

that a defendant is personally involved in the unconstitutional conduct," a claim that a defendant "had daily meetings" in which he or she was "made aware of . . . ongoing issues," accompanied by an allegation that the defendant "ignored [constitutional] violations" may be sufficient to allege personal involvement. *Pagan v. Westchester County*, No. 12-CV-7669, 2014 WL 982876, at *22 (S.D.N.Y. Mar. 12, 2014), *reconsideration granted on other grounds*, 2015 WL 337403 (S.D.N.Y. Jan. 26, 2015). Here, Plaintiff has alleged that Fischer, Heath, and Keyser were made aware, through Unusual Incident Reports and the Inmate Liaison Committee, that there was a widespread policy of using unnecessary force against inmates. (*See* Second Am. Compl. ¶¶ 22–24.) Although Plaintiff will not be able to rely on such broad allegations at summary judgment or at trial, the Court is satisfied that these allegations are sufficient to at least "nudge[] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Accordingly, even if the Court has some "doubt[] that [P]laintiff ultimately will prevail on his claims against" Defendants, the issue at this stage "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *James v. Aidala*, 389 F. Supp. 2d 451, 453 (W.D.N.Y. 2005) (internal quotation marks omitted). Under the facts alleged, the Court holds that Plaintiff has stated a claim against Fischer, Heath, and Keyser for their personal involvement in violations of Plaintiff's constitutional rights, and the Motion is therefore denied in that respect.

### 2.  Failure to Intervene

Next, Moving Defendants move to dismiss the claim against Barnes on the ground that Plaintiff has failed to state a claim under the Eighth Amendment against Barnes. (*See* Defs.' Mem. 9.) The Court has already held that the allegations in Plaintiff's First Amended Complaint were insufficient to allege that "Barnes had reason to know that excessive force was being used

and had a realistic opportunity to intervene to prevent the harm from occurring." (*See* Op. &

Order 33.)  Thus, Plaintiff's Second Amended Complaint, alleging near-identical facts with

respect to Barnes, may only be salvaged on this point if the new allegations against Barnes are

sufficient to state a claim under the Eighth Amendment.

      As set forth above, the only new allegation with respect to Barnes relates to the fact that

"[p]rior to the assault, [D]efendant Barnes was sitting in a chair on Q-Gallery and observed

Plaintiff cross from R-Gallery to W-Gallery," and that "Barnes upon witnessing [D]efendants

Woody, Dowtin and Bellinger, [s]pecifically Woody and Dowtin[,] knew or should have known

based on his knowledge of prior incidents involving Dowtin and/or Woody, that Plaintiff would

likely be assaulted."  (Second Am. Compl. ¶ 49.)  This allegation is insufficient to state a claim

against Barnes.

      Under the Eighth Amendment, prison officials must "take reasonable measures to

guarantee the safety of inmates in their custody."  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614,

620 (2d Cir. 1996); *see also McRae v. Gentile*, No. 14-CV-783, 2015 WL 7292875, at *2

(N.D.N.Y. Oct. 20, 2015) (same), *adopted by* 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015).

Moreover, "[l]aw enforcement officials, including prison officials, can be held liable under

§ 1983 for failing to intervene in a situation where another official is violating an inmate's

constitutional rights, including the use of excessive force, in their presence."  *McRae*, 2015 WL

7292875, at *2; *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely

recognized that all law enforcement officials have an affirmative duty to intervene to protect the

constitutional rights of citizens from infringement by other law enforcement officers in their

presence."); *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *8 (S.D.N.Y. Dec. 5,

2011) ("A law enforcement officer 'has an affirmative duty to intercede on the behalf of a citizen

20

whose constitutional rights are being violated in his presence by other officers.'" (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997))). Specifically, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used," provided there was "a realistic opportunity to intervene to prevent the harm from occurring." *Rahman*, 2011 WL 6028212, at *8 (alteration and internal quotation marks omitted); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be."); *Tavares v. City of New York*, No. 08-CV-3782, 2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011) ("An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used, or that any constitutional violation has been committed by a law enforcement official." (alterations omitted) (quoting *Anderson*, 17 F.3d at 557)), *adopted by* 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011).

Here, Plaintiff offers only the bare assertion that because some of Defendants had been involved in "prior incidents," Barnes should have known that another altercation was about to ensue. The implication of this allegation is that Barnes is responsible for intervening any time Woody, Dawtin, or Bellinger were in the vicinity of Plaintiff (or, presumably, any other inmate). There is no basis in the law for such an obligation, and the mere fact that Barnes happened to be nearby when Woody, Dawtin, and Bellinger first approached Plaintiff does nothing to support Plaintiff's claim that Barnes violated Plaintiff's constitutional rights. Plaintiff's recourse is against Woody, Dawtin, Bellinger, and the other prison officials personally involved in the alleged violations of Plaintiff's rights.

Case 7:13-cv-08287-KMK-PED   Document 107   Filed 03/08/17   Page 22 of 22

## III. Conclusion

For the foregoing reasons, Defendants' Motion is granted in part and denied in part.

Defendants' Motion is granted with respect to Plaintiff's claim against Barnes. Because Plaintiff

has already had an opportunity to amend, that dismissal is with prejudice. Defendants' Motion is

denied with respect to Fischer, Heath, and Keyser. The Court will hold an initial conference on

April 4, 2017 at 10:00 AM. The Clerk of Court is respectfully directed to terminate the pending

Motion. (*See* Dkt. No. 95.)

SO ORDERED.

DATED:   March 8 , 2017
         White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

22